Filed 1/4/22  P. v. Nedd CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073575 |
| v. | (Super.Ct.Nos. 16CR020590 & 16CR020593) |
| RICHARD TOBIAS NEDD, et al., | |
| Defendants and Appellants. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| | [NO CHANGE IN JUDGMENT] |

THE COURT:

The Petition for rehearing filed by defendant and appellant Richard Tobias Nedd on December 23, 2021, is denied.  The opinion filed on this matter on December 21, 2021, is modified as follows:

On page 5, the first full paragraph is stricken, and the following paragraph is added in its place:

1

We agree with Nedd's claim that double jeopardy principles bar retrial of the premeditation allegation against Nedd in count 2, based on his jury's not true finding on the premeditation allegation. Our reversal of defendants' convictions and sentences in counts 1 and 2 makes it unnecessary to address two other claims raised in this appeal: (1) defendants' claims that their juries were erroneously instructed that they could convict defendants of the attempted premediated murder of Richard F. in count 2 based on a natural and probable consequences theory; and (2) defendants' claims that their six-year, unstayed terms, for the first degree residential robbery of Richard F. in count 4, must be stayed due to their greater, indeterminate terms on counts 1 and 2.

On page 59, after the third line, and before the heading "B. *Substantial Evidence* . . . ," add the following subsection:

3. <u>Nedd May Not Be Retried on the Premeditation Allegation in Count 2</u>

Nedd claims double jeopardy principles bar retrying him on the premeditation allegation on the attempted murder charge in count 2 because his jury found the premeditation allegation in count 2 *not true*. We agree.

(a) *Background*

Nedd's jury was given guilty and not guilty verdict forms for the attempted murder charge in count 2 and separate, special allegation forms for finding the premeditation allegation in count 2 true or not true. The verdict forms allowed the jury to find Nedd (1) guilty of "attempted willful, deliberate, and premeditated murder . . . as charged in count 2 of the information" [verdict form 2-A], or (2) "not guilty as charged in

2

count 2 of the information" [verdict form 2-B]. The special allegation form asked the jury to find whether "the allegation that the offense charged in count 2 was committed willfully, deliberately, and with premeditation" was true or not true. Thus, the guilty verdict form for count 2 contained premeditation language and did not give Nedd's jury the option of finding Nedd guilty in count 1 without also finding that the attempted murder was willful, deliberate, and premeditated.

During its deliberations, Nedd's jury sent the court a note asking, "Why is 'attempted, willful, deliberate, and premeditated' written on [the] count 2 special allegation [form] AND the verdict [form] 2-A?" After conferring with counsel, the court responded to the note in writing: "As to verdict 2A: [¶] The jury is required to make a specific finding as to 'willful, deliberate, and premeditated' murder. It is redundant insofar as the charge includes the same language, but it is necessary to comply with the law." (Italics added.) Nedd's jury later returned verdict form 2-A, finding Nedd guilty of the "attempted willful, deliberate, and premeditated murder" of Richard F. in count 2, but finding the premeditation allegation *not true* on the special allegation form in count 2.

The trial concluded in September 2016, but defendants were not sentenced until August 23, 2019. The trial judge (Hon. Victor Stull) died in 2018, and another judge (Hon. Cara D. Hutson) sentenced defendants. Despite the not true finding on the special allegation form for the premeditation allegation in count 2, at sentencing the court treated Nedd as having been convicted of attempted *premeditated* murder in count 2—ostensibly based on the premeditation language in verdict form 2-A. Nedd was sentenced to seven years to life (life with the possibility of parole, with a seven-year minimum parole

3

eligibility period), the required sentence for attempted *premeditated* murder. (§§ 664, subd. (a), 3046; *People v. Bright* (1996) 12 Ca1.4th 652, 662).) An attempted murder that is not premeditated is punishable by five, seven, or nine years in state prison. (§ 664, subd. (a); *People v. Seel* (2004) 34 Ca1.4th 535, 541.)

(b) *Analysis*

Nedd claims that verdict form 2-A was defective in that it did not give his jury the option of finding him guilty of attempted murder and only allowed his jury to find him guilty of attempted premeditated murder. He notes that his jury was "clearly confused" as to why verdict form 2-A included the phrase "willful, deliberate, and premeditated," when the jury was asked to separately find, in the special allegation form, whether the attempted murder, if any, was willful, deliberate, and premeditated. He claims the court's response to the jury's question about the repeated premeditation language in verdict form 2-A and in the special allegation form failed to clear up the confusion and incorrectly stated the law.

The trial court has a "duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Ca1.3d 1179, 1212; *People v. Smithey* (1999) 20 Ca1.4th 936, 985 ["Section 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law."]; § 1138.) In response to the jury's question as to why verdict form 2-A and the special allegation form for the premeditation allegation both contained the phrase " 'willful, deliberate and premeditated,' " the court correctly told the jury that it was required to "make a specific finding as to 'willful, deliberate, and premeditated' murder." (§ 664, subd. (a)). The court told the jury that the

4

premeditation allegation was "redundant" to the charged offense of attempted willful, deliberate, and premeditated murder, "insofar as the charge includes the same language, but it is necessary to comply with the law."

The court's response was erroneous. It was unnecessary to have the willful, deliberate, and premediated language used both in the verdict form for the charge and in the special premeditation allegation. Such language in the guilty and not guilty verdict forms created confusion and ambiguity. Under section 664 and the applicable instructions, the jury was first required to determine whether the People proved Nedd's guilt of the attempted murder charge beyond a reasonable doubt. The jury was specifically instructed that if it found Nedd guilty of attempted murder, only then would it proceed to determine the truth of the premeditation allegation—whether the attempted murder was done willfully, and with deliberation and premeditation.

The court's response to the jury's question did not remedy the defect in verdict form 2-A. As Nedd points out, verdict form 2-A was defective because it did not give his jury the option of finding him guilty of only attempted murder. Instead, it only allowed his jury to find him guilty of attempted premeditated murder. We agree that the court should not have instructed the jury in this manner. The court should have remedied this defect by striking the "willful, deliberate and premeditated" language from verdict form 2-A, either (1) when the jury questioned why this language appeared in verdict form 2-A and in the special allegation form, or (2) after the jury returned its verdicts and the special allegation form, finding the premeditation allegation not true.

5

Nevertheless, the record shows that Nedd's jury intended to find Nedd guilty only of attempted murder, not attempted *premeditated* murder. In light of the court's response to its question, Nedd's jury must have believed that its not true finding on the premeditation allegation meant that it was only convicting Nedd of attempted murder when it signed verdict form 2-A. That is, Nedd's jury must have believed that the premeditation language in verdict form 2-A was of no effect in light of its not true finding on the premeditation allegation. As Nedd further argues, double jeopardy principles bar the prosecution from retrying him on the premeditation allegation in count 2, given his prior acquittal on the allegation. (*People v. Carbajal* (2013) 56 Cal.4th 521, 533-534; *Bigelow v. Superior Court* (1989) 208 Cal.App.3d 1127, 1133-1138.)

On page 70, the following sentence is added to the end of the paragraph under the heading, "V. DISPOSITION."

Nedd's retrial for the attempted murder of Richard F. count 2, if any, is limited to a charge of attempted murder and cannot include an allegation that the attempted murder was willful, deliberate, and premeditated.

6

There is no change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

RAMIREZ
P.J.

McKINSTER
J.

7

Filed 12/21/21  P. v. Nedd CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD TOBIAS NEDD, et al.,<br><br>    Defendants and Appellants. | E073575<br><br>(Super.Ct.Nos. 16CR020590 & 16CR020593)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Victor R. Stull and Cara D. Hutson, Judges.  Affirmed in part; reversed in part with directions.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant Richard Tobias Nedd.  Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant Arieon Shoulders.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

In 2016, defendants Richard Nedd and Arieon Shoulders were tried together before separate juries and found guilty as charged of the first degree murder of Julian K. (Pen. Code, § 187, subd. (a),[1] count 1); the attempted premeditated murder of Richard F. (§§ 664, subd. (a), 187, subd. (a), count 2), and the first degree residential robberies of Richard F. and Julian K. (§§ 211, 212.5, count 3 [Julian K.] & count 4 [Richard F.].)

Shoulders's jury found that the attempted murder of Richard F. was willful, deliberate, and premeditated. (§ 664, subd. (a)) But Nedd's jury found the same premeditation allegation in count 2 not true. Nonetheless, the guilty verdict form in count 2 states that Nedd is guilty of the willful, deliberate, and premeditated attempted murder of Richard F.

Nedd was separately charged and convicted of being a prohibited person in possession of a firearm. (§ 29805, subd. (a), count 6). Shoulders was separately charged and acquitted of assaulting Richard F. with a firearm, namely, Richard F.'s shotgun. (§ 245, subd. (a)(2), count 5.) Nedd was sentenced to six years eight months plus 32 years to life in state prison. Shoulders was sentenced to six years plus 32 years to life in

---

[1] Unspecified statutory references are to the Penal Code.

state prison.[2]

Defendants were sentenced in August 2019—after the trial court denied motions for a new trial on counts 1 and 2 based on the amendments that Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) made to sections 188 and 189, effective January 1, 2019. (Cal. Const., art. IV, § 8, subd. (c).) Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

In count 1, the juries were solely instructed on a felony murder theory—that they could convict defendants of first degree murder of Julian K. if they found that the murder of Julian K. occurred during the commission of the first degree residential robbery of Julian K. and that another person, defendants' cohort, identified before trial as Richard Tarpley but referred to during trial as the "bald man," shot and killed Julian K. (CALCRIM No. 540B (2018).) In count 2, the juries were alternatively instructed that they could convict defendants of the attempted premeditated murder of Richard F. based

---

[2] Defendants' indeterminate sentences include 25 years to life for the first degree murder of Julian K. (count 1), plus seven years to life (life with a minimum parole eligibility date of 7 years) for the attempted premeditated murder of Richard F. (count 2). Defendants were also sentenced to consecutive six-year terms for the robbery of Richard F. (count 4). The court imposed but stayed six-year terms on defendants' convictions for the robbery of Julian K. (count 3). Nedd was also sentenced to a consecutive 8-month term (1/3 the middle term of 2 years) for his unlawful firearm possession conviction (count 6).

on a natural and probable consequences theory—that the attempted premeditated murder of Richard F. was a natural and probable consequence of the first degree residential robbery of Richard F.—or as direct aiders and abettors to the attempted premeditated murder of Richard F. by defendants' cohort. (CALCRIM Nos. 401, 402, 601 (2018).)

In this appeal, defendants claim their motions for a new trial in counts 1 and 2 were erroneously denied to the extent the motions were based on Senate Bill 1437. In supplemental briefing, they also claim that Senate Bill No. 775 (2020-2021 Reg. Sess.) (Senate Bill 775), effective January 1, 2022 (Cal. Const., art. IV, § 8, subd. (c)), requires this court to reverse their convictions in counts 1 and 2 and remand the matter for a new trial on these counts. Senate Bill 775 "[c]larifies that persons who were convicted of attempted murder, or manslaughter under a theory of felony murder and the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a).) Senate Bill 775 also amended section 1170.95 to provide that persons with nonfinal convictions for murder, attempted murder or manslaughter may challenge the validity of those convictions on direct appeal "based on the changes made to Sections 188 and 189 by Senate Bill 1437 . . . ." (Stats. 2021, ch. 551, § 2; § 1170.95, subd. (g), eff. Jan 1. 2022.)

The People concede and we agree that defendants' Senate Bill 1437 claims have merit and are cognizable in this direct appeal from defendants' nonfinal murder and attempted murder convictions. The trial record does not show beyond a reasonable doubt that either defendant acted with intent to kill or with reckless disregard for human life, either in aiding and abetting the cohort's felony murder of Julian K. or in aiding and

4

abetting the cohort's attempted murder of Richard F. Thus, we reverse defendants' murder and attempted murder convictions in counts 1 and 2 and remand the matter for a new trial on counts 1 and 2.

Our reversal of defendants' convictions and sentences in counts 1 and 2 makes it unnecessary to address three other claims raised in this appeal: (1) Nedd's claim that his attempted premeditated murder conviction in count 2 must be reduced to attempted murder based on the jury's not true finding on the premeditation allegation in count 2; (2) defendants' claim that their juries were erroneously instructed that they could convict defendants of the attempted *premeditated* murder of Richard F. in count 2 based on a natural and probable consequences theory; and (3) defendants' claims that their six-year, unstayed terms, for the first degree residential robbery of Richard F. in count 4, must be stayed in light of their greater, indeterminate terms on counts 1 and 2.

We find no merit to defendants' other claims, namely, that (1) all of their convictions must be reversed and all of the charges dismissed, with prejudice, due to the prosecution's multiple pretrial *Brady*[3] errors and the prosecution's additional due process violation in failing to disclose the identity of a material witness, Glenn Blackman, until shortly before trial; (2) insufficient evidence supports the possession element of their convictions in count 3 for the first degree residential robbery of Julian K.; (3) CALCRIM No. 315 violated their due process rights; (4) cumulative trial error requires reversal of

---

[3]  *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

5

their remaining convictions in counts 3, 4, and 6; and (5) Nedd's claim that the matter must be remanded for a *Franklin*[4] hearing.

Thus, we affirm defendants' first degree residential robbery convictions in counts 3, 4, and Nedd's unlawful firearm possession conviction in count 6, but we reverse defendants' felony murder and attempted premeditated murder convictions in counts 1 and 2, and we remand the matter for a new trial on counts 1 and 2.

## II. TRIAL EVIDENCE

A. *The August 6, 2015 Shootings and Robberies*

In August 2015, Richard F. was living in a ground-floor apartment in Apple Valley with his girlfriend, his friend Julian K., and Julian K.'s three-year-old daughter. Richard F. was selling marijuana from the apartment and advertising the marijuana on social media. The marijuana was kept in two clear, plastic turkey bags in the kitchen. One bag containing three to four ounces of marijuana was on the kitchen counter, and a second bag containing two to three ounces was on top of the refrigerator.

During the morning of August 6, 2015, Richard F. took photos of the marijuana and posted the photos on his social media page. Within a couple of hours, Shoulders sent a private message to Richard F. through Shoulders's social media account, saying he wanted to buy the marijuana. Throughout the afternoon, Richard F. and Shoulders continued to message or text each other about Shoulders coming to the apartment and buying the marijuana.

---

**4** *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

6

At 4:32 p.m., Shoulders asked Richard F. by text message how much the marijuana would cost. At 4:34 p.m., Richard F. responded by text that a quarter pound would cost $650, and the rest of the marijuana, or one ounce, would cost $175, for a total cost of $825. Richard F. gave Shoulders the address of his apartment and asked Shoulders to park in the driveway, next to Richard F.'s Chevy Tahoe, and to watch out for children.

Between 5:00 and 6:00 p.m., Richard F. was looking out of his apartment's living room window when he saw a Jeep Compass back into the driveway and block his Tahoe. Shoulders got out of the Jeep Compass while the driver stayed inside. Richard F. did not see a third person in the Jeep. Shoulders texted Richard F. and asked him to come outside, but Richard F. told Shoulders he wanted the marijuana transaction to take place inside the apartment.

Richard F. let Shoulders into the apartment through the front door and showed him the bag of marijuana on the kitchen counter. Shoulders said he already had some marijuana like that and asked Richard F. whether he had anything better. Richard F. said, "yes," and told Shoulders that the higher-grade marijuana would cost $800 to $900. Shoulders told Richard F. that he did not have that much money; he would have to leave, get the money, and come back.

Shoulders left the apartment, and he and Richard F. continued to exchange text messages. Richard F. became suspicious and no longer wanted to sell the marijuana to Shoulders because the circumstances "seemed fishy." He texted Shoulders, asking how long it was going to take him to return and that he had to run errands.

7

Between 8:00 and 9:00 p.m., Shoulders telephoned his girlfriend and asked her to delete or deactivate his social media page. The girlfriend "erased" the social media page, preventing anyone from accessing it. Around 9:00 p.m., Shoulders returned to Richard F.'s apartment, again, as a passenger in the Jeep Compass. Although there was a parking space available next to Richard F.'s Tahoe, the Jeep again backed into the driveway and again blocked the Tahoe.

Shoulders got out of the Jeep, and Richard F. let him into the apartment. As Richard F. and Shoulders walked into the kitchen, Julian K. came out of one of the bedrooms, walked to the front door, and stopped a man who was trying to get into the apartment through the front door. Richard F. saw the man at the door and described him (the cohort) as dark-skinned, with a bald head, and wearing a blue T-shirt.[5] Julian K. walked outside to talk to the cohort.

While Julian K. was outside, Shoulders told Richard F. that his friend, the cohort, was "going half with him" on the marijuana purchase, and Shoulders asked Richard F. to give Julian K. some of the marijuana to show the cohort. Richard F. gave Julian K. a piece of marijuana from the bag on top of the refrigerator to show to the cohort. Julian K. took the piece outside, came back in, and asked how much money he was supposed to collect from the cohort. Shoulders told Julian K. to get $100, and Julian K. walked outside again.

---

[5] Information outside of the trial revealed that the cohort was Rayvon Tarpley, but because Tarpley was never identified at trial as the cohort, at times we refer to him as the cohort or the bald man rather than as Tarpley.

Julian K. then came back into the apartment, with his hands laced behind his head, and with the cohort holding a black .40-caliber handgun, either to the back of his head or to the back of his rib cage. Shoulders looked "shocked." Fearing for his life and the lives of everyone else inside the apartment, Richard F. retrieved a shotgun, which he kept beneath the kitchen counter. The shotgun had one round in its chamber but was otherwise unloaded. Shoulders tried to grab the shotgun from Richard F. and, as the two of them struggled for the shotgun, the round discharged into the kitchen ceiling.

Richard F. fell to the floor; Shoulders gained control of the shotgun; and Shoulders struck Richard F. several times with the shotgun as Richard F. lay on the floor. As soon as Richard F. wielded the shotgun toward Shoulders, the cohort fired several shots and, after a short break, the cohort fired several additional shots.

T.S. lived in a nearby apartment and was outside of her apartment when she "noticed a car pull in backwards." Several people (more than 1 but fewer than 5) were in the car, and more than one person got out of the car. A short time later, T.S. "looked up" and saw Julian K. standing in the doorway of Richard F.'s apartment, "and a person standing right in front of [Julian K.,] facing toward [Julian K.]" with his right arm raised up and across Julian K.'s shoulder.

Julian K. "made real quick eye contact" with T.S. T.S. described the man who was standing in front of Julian K. (the cohort) as "shorter," with either "a fade" or "bald." It looked as though the bald man was trying to move Julian K. "out of the way . . . to get inside" the apartment. T.S. and another neighbor then heard two sets of gunshots, separated by a pause, and T.S. called 911 after she heard the first set of gunshots.

9

According to Richard F., after the first set of gunshots was fired, Nedd ran into the apartment, and Shoulders, while still holding the shotgun, yelled to Nedd to "grab the money." Nedd grabbed money that had fallen from Richard F.'s pocket onto the kitchen floor. A second or two after Nedd grabbed the money, and while the cohort was firing the second round of shots, a bullet struck Richard F. in the stomach. Richard F. did not see whether Nedd had a firearm. Shoulders, Nedd, and the cohort left the apartment through the front door. Richard F. did not see the Jeep leave, but he heard tires screeching; and he later noticed that his shotgun and the marijuana were missing from his apartment,[6] along with the money that had fallen on the kitchen floor. Richard F. further testified that Julian K. was inside the apartment, near the front door, when the first round of shots was fired and was outside when the second round of shots was fired. Richard F. was inside the apartment when all of the shots were fired and when a bullet struck Richard F.

B. *The Aftermath of the Shootings and Robberies*

After Shoulders, Nedd, and the cohort left his apartment, Richard F. went outside, sat on a bench, and dialed 911, while Julian K., who had been shot several times, sought help from T.S. in her apartment. Richard F. was airlifted to a hospital and underwent emergency surgery to repair his gunshot wound. Julian K. died at the hospital from several gunshot wounds. Some of Julian K.'s gunshot wounds had soot or stippling but others did not. This was consistent with Julian K. being in close proximity to the shooter

---

[6] At some point, Richard F. placed the bag of marijuana that was on top of the refrigerator with the bag of marijuana on the kitchen counter.

10

when he was first shot, then running away from the shooter while being struck by additional bullets. Julian K. told a sheriff's deputy that he had been shot outside.

Law enforcement officers found eight .40-caliber bullet casings inside Richard F.'s apartment and on the ground outside of the apartment. The parties stipulated that a qualified criminalist had determined that all eight of the .40-caliber casings were fired from the same weapon. A hat belonging to Shoulders was found on the kitchen counter. Marijuana remnants were strewn on the apartment floor and outside of the apartment. Around $110 in cash was found strewn on the floor near the kitchen.[7] An empty box for a .12-gauge shotgun was also found in the apartment.

C. *Richard F.'s Pretrial Statements*

A detective interviewed Richard F. at the hospital on August 7, 2015, shortly after Richard F. came out of surgery. Richard F. said he met Shoulders on a social media page dealing with medical marijuana, and he planned to give marijuana to Shoulders in return for a donation. He said there were only two people involved in the crimes. He described Shoulders as a thin, "black" male with short hair or bald, in his mid-20's, with a tattoo on his face. He saw Shoulders get out of the passenger side of the Jeep. He described the second man, whom he said he saw get out of the driver's side of the Jeep, as stalky, bald, and having a very dark complexion.

---

[7] Police found approximately $110 in cash, mostly in $20 bills, strewn around on the kitchen floor. Richard F. testified that he had around $100 in his pocket in several denominations, and his girlfriend told him that she saw $30 on the floor when he was taken to the hospital.

11

Richard F. also told the detective that the second man later walked into the apartment with a gun to Julian K.'s head, and that, upon seeing this, Shoulders looked surprised. Richard F. also said that, while the second man was shooting at Julian K., Shoulders pulled out a gun and shot Richard F. He did not say anything about being struck with a shotgun. He said that Shoulders and the bald man both had handguns similar to "Glock brand" handguns. The interviewing detective was familiar with such handguns and had used both .40-caliber and nine-millimeter Glock handguns.

Richard F. showed the interviewing detective his social media messages from Shoulders. When the detective clicked on Shoulders's social media page, the page had been deactivated. The detective had the impression, during the August 7, 2015 interview, that Richard F. had already spoken to his neighbors about what had happened on August 6. During a subsequent interview on August 19, Richard F. said for the first time that there were three men involved in the crimes—one was shooting at Julian K., another came into the apartment with a gun, and Richard F. wrestled with the third man, Shoulders, over a shotgun. During a follow-up interview on June 8, 2016, Richard F. said he did not see who took his marijuana. For the first time at trial, in August 2016, Richard F. testified that Nedd came running into the apartment and picked up the money that had fallen from his pocket and onto the kitchen floor.

D. *Nedd's August 7, 2015 Arrest*

On August 7, 2015, a sheriff's deputy stopped Nedd while Nedd was driving the Jeep Compass used during the shooting. Nedd was the only person in the Jeep. Nedd had a small amount of marijuana on his person. The deputy searched the Jeep and found

12

a loaded, black, nine-millimeter semi-automatic Smith and Wesson handgun, hidden in the center console beneath the glove box. The deputy called a homicide detective who retrieved the gun and placed Nedd under arrest.[8] Two cell phones were also recovered from the Jeep. In count 6, Nedd was charged with being a prohibited person in possession of a firearm, based on his possession of the nine-millimeter Smith and Wesson. (§ 29850.) Before Nedd's jury, the parties stipulated that Nedd had a prior conviction for a qualifying offense for purposes of count 6.

E. *Nedd's and Shoulders's Pretrial Statements (Admitted Before Nedd's Jury)*

### 1. Nedd's Interview Statements

Following his arrest on August 7, 2015, Nedd was taken to the Victorville City Police station where a homicide detective interviewed him after he waived his *Miranda*[9] rights. An audio recording of the interview was played for Nedd's jury.

During the interview, Nedd told the detective that the Jeep Compass he was driving belonged to his mother, and he had the car all day on August 6. He gave a detailed account of his whereabouts on August 6. He said he went to a park at 5:45 p.m., where he coached youth football, and stayed at the park, talking to the other coaches, until 8:45 p.m. He then went to a fast food restaurant with his girlfriend, went home, watched television with his girlfriend, and stayed home for the rest of the evening.

---

[8] It was determined that the nine-millimeter handgun found in the Jeep Compass was not used in the August 6, 2015 shooting because a nine-millimeter handgun cannot fire a .40 caliber cartridge.

[9] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

The detective then told Nedd that the Jeep Compass had been used in a homicide; they had a video of the car and its license plate;[10] and this was why Nedd was stopped while driving the car. The detective urged Nedd to tell the truth. Nedd initially said he had been truthful about his whereabouts on August 6. He later admitted he was at the apartment but claimed he did not do anything, and he denied planning to kill anyone. He said his friend was supposed to be buying marijuana, but his friend said, "The dude upped the gauge on him and tried to shoot him." He was outside of the apartment the entire time, and he never left the Jeep Compass. He heard gunshots and thought his friend "got shot."

When asked for further details, Nedd said he drove his friend, Shoulders, to the apartment around 7:00 p.m., and he identified a photo of Shoulders. They were supposed to be buying four ounces of marijuana for $400. Shoulders was in the front passenger seat. Nedd backed the Jeep Compass into the driveway because "the dude" who lived in the apartment had told them to "back in." Shoulders went inside the apartment, while Nedd waited in the car. Shoulders came back to the car and told Nedd two things: (1) they needed to pick up Shoulders's friend, who had the rest of the money that was needed to buy the marijuana, and (2) the dude in the apartment had a shotgun or "gauge" "on the table." Nedd told Shoulders that if Shoulders did not " 'feel comfortable' " buying the

---

[10] The detective testified at trial that law enforcement had a video showing the Jeep Compass at the apartment, but the video was of "grainy quality" and did not show the car's license plate.

marijuana at that point, they would come back after they picked up one of Shoulders's friends from Shoulders's " 'hood.' "

Nedd and Shoulders then went to pick up Shoulders's friend (the cohort) who met them at a liquor store. The three of them returned to the apartment, and Nedd again backed into the driveway as "the dude" in the apartment had told Shoulders to do over the telephone. Shoulders and the cohort got out of the car while Nedd waited in the car. Shoulders went inside the apartment, but someone would not let the cohort inside, and the cohort walked back by the car. Then someone came out of the apartment, showed some marijuana, and said he wanted $100. This person and the cohort then went into the apartment together. Nedd then heard gunshots and thought someone was shooting at him.

Shoulders and the cohort came running out of the apartment and got into Nedd's Jeep Compass. The cohort was holding a shotgun and a silver, semi-automatic handgun, while Shoulders was holding a large bag of marijuana. Shoulders did not have anything else in his hands. Shoulders and the cohort said, " 'Go, go, go, go,' " and Nedd drove away, asking what had happened and who got shot; but Shoulders and the cohort would not tell Nedd what had happened or whether anyone was shot. Nedd told Shoulders and the cohort to throw the shotgun out of his car window, and cohort did so near a convenience store. But the cohort kept the handgun that he was holding when he came out of the apartment. Nedd then dropped off the cohort where he had picked him up, took Shoulders home, then drove himself home. The cohort took the bag of marijuana with him.

15

Nedd did not know the cohort's name; he only knew the cohort by his street name, "Booneyard." Nedd described the cohort as bald, chubby, and "black," with a dark complexion, and around 28 or 29 years old. The cohort was wearing a blue T-shirt and dark navy blue jeans. Nedd had never met the cohort before. Nedd believed that Shoulders and the cohort were only going into the apartment to buy marijuana. Nedd understood that the man in the apartment was selling marijuana through social media and that Shoulders had met the man through social media. The black and silver handgun that Nedd had in the Jeep Compass when he was arrested on August 7 was his own gun that he used for protection. This gun was never taken into the apartment, and the man in the apartment would not be able to say that he had seen it.

2. Nedd's and Shoulders's Patrol Car Statements

Both Nedd and Shoulders were at the Victorville City Police station at the same time on August 7, 2015. Around 6:00 p.m., after Nedd was interviewed, he was placed in the back of a patrol car with Shoulders, and the two of them were transported to jail.[11] A digital recorder was placed near the back seat of the patrol car to record any conversation between Nedd and Shoulders. The recording was played only for Nedd's jury.

Nedd said to Shoulders, "I am being charged with a neener.[12] Try to switch it to self-defense . . . ." Nedd continued: "Like you seen that . . . shotgun on a table. Whoopty-woop, you know. Try to make it seem like he shot at you or something. [¶] . . .

---

[11] Shoulders was under arrest at the time he was placed in a patrol car with Nedd on August 7, 2015, but the circumstances of Shoulders's arrest are not in the record.

[12] A "neener" is a nick name for a nine-millimeter handgun.

[¶] . . . Switch it all around . . . ." Shoulders asked, "They got your phone, huh?" Nedd responded, "Yeah, bro! I deleted everything though. I was going to go sell the pistol . . . but the forty (40) gone, bro." Shoulders said, "I ain't going down . . . . I didn't know the shooter." Nedd responded, "That's what I said, 'I didn't know who . . . they were talking about.' " Shoulders then told Nedd not to talk to him because there were speakers in the patrol car, and "they'll hear us talking." Nedd said, "Yeah I know, that's why I am not tripping."

## F. *The Marijuana Found at Nedd's Residence*

Around the time Nedd was interviewed on August 7, 2015, a search warrant was executed at Nedd's residence. Behind a refrigerator in the garage of the residence, officers found a green canvass range bag containing a large plastic roasting bag, or turkey bag, with around three ounces of marijuana in it, and a glass jar, with less than one ounce of marijuana in it. The marijuana was "cush" marijuana, the same type of marijuana that Richard F. had in his apartment. It is very uncommon to package marijuana in turkey bags.

## G. *Defense Evidence*

Defense counsel attempted to discredit Richard F.'s trial testimony by adducing his prior inconsistent statements. Shortly after the shooting, Richard F. told a detective who responded to the scene that an unknown vehicle had pulled into the driveway, there were two people in the vehicle, and the two people tried to steal music equipment that Richard F. used to produce songs. At that time, Richard F. did not say that he had been selling marijuana from his apartment.

17

During the same conversation at the scene, Richard F. described the two occupants of the vehicle as a "black" male, around five feet eight inches tall, with a tattoo on his face, and a second "black" male, taller than five feet ten inches. He was unable to give any further descriptions of the suspects. He said that one of the suspects shot Julian K., at which point he retrieved a shotgun and fired one round before the shotgun was taken from him. He was unsure which suspect took the shotgun. He appeared to be in a lot of pain, was bleeding from his abdomen, and told the detective that he was in too much pain to continue talking.

## III. DEFENDANTS' CLAIMS OF MULTIPLE PRETRIAL *BRADY* ERROR AND RELATED DUE PROCESS CLAIMS LACK MERIT

We first address defendants claims that the court deprived them of their due process right to a fair trial in refusing to dismiss the charges, with prejudice, based on (1) the prosecution's *Brady* errors in failing to turn over multiple items of discovery until shortly before the trial was originally scheduled to begin on May 9, 2016 (*Brady*, *supra*, 373 U.S. 83), and (2) the prosecution's related due process violation in failing to disclose Glenn Blackman's identity until shortly before the scheduled May 9 trial. Defendants claim they were prejudiced by the prosecution's failure to disclose, until May 6, 2016, statements that the cohort—who was identified before trial as Rayvon Tarpley—made to Blackman, in which Tarpley told Blackman that he, Tarpley, had " 'fucked up' " and " 'had to shoot someone' " at Richard F.'s apartment on August 6, 2015 (the Tarpley/Blackman information).

18

We conclude the court properly refused to dismiss the charges with prejudice as a remedy for the prosecution's failure to disclose the Tarpley/Blackman information and Blackman's identity until May 6, 2016. The court found, and substantial evidence shows, that the prosecution's alleged *Brady* errors, including its failure to earlier disclose the Tarpley/Blackman information (1) were negligent but not intentional or "flagrant," (2) did not prejudice defendants, and (3) were remedied by the court's dismissal of the firearm allegations in counts 1 through 4, and the prosecution's subsequent dismissal and refiling of the substantive charges.

As we explain, the absence of the Tarpley/Blackman information at trial was not prejudicial to defendants. Further, the dismissal of the first amended information and the subsequent refiling of the charges vacated the May 9, 2016 trial date and gave the defense ample additional time to locate Blackman and secure his testimony at trial. The defense's inability to secure Blackman's trial testimony was not attributable to the prosecution's late disclosure of the Tarpley/Blackman information or Blackman's contact information.

A. *Proceedings Concerning the Prosecution's Alleged* Brady *Violations*

    1. <u>Background/ The February 2016 Preliminary Hearing Evidence</u>

At the preliminary hearing on February 29, 2016, Richard F. testified that there were three men involved in the shootings and robberies. Julian K. stopped a bald, "dark-skinned dude" wearing a blue T-shirt (the cohort) from coming into apartment, after Shoulders came in. After the shooting began, "a short dude," whom Richard F. identified as Nedd, ran into the apartment, and Shoulders said, "Get the money." Richard F. said he was shot after Nedd ran into the apartment, and he believed that the cohort and Julian K.

19

were outside of the apartment when he was shot. But Richard F. did not see who shot him, and he was unsure whether Nedd or Shoulders had any firearms in their hands, other than the shotgun that Shoulders grabbed from him. Richard F. first told a detective that a third man was involved during an August 19, 2015 interview.

San Bernardino County Sheriff's Detective T.M. testified about his August 7, 2015 interview with Richard F. During the interview, Richard F. said that only two men were in the apartment, namely, Shoulders and a dark-skinned man, and that both of them had Glock-type handguns. Richard F. also said that Shoulders fired his handgun at Richard F. before Shoulders grabbed Richard F.'s shotgun, and after Shoulders grabbed the shotgun, he, Shoulders, fired his handgun at Richard F. again. Richard F. believed he was shot by Shoulders the second time that Shoulders fired at him.

The lead investigator in this case, San Bernardino County Sheriff's Detective A.S., testified that he interviewed Nedd on September 30, 2015. The detective wanted to talk to Nedd about Tarpley's death. No further evidence about Nedd's September 30 interview or Tarpley's death was adduced.

Detective T.M. also testified about his August 7, 2015 interview with Nedd, in which Nedd said that he and Shoulders picked up "Booneyard," and the three of them returned to the apartment after Shoulders had seen that Richard F. had a shotgun. When asked whether he had been able to determine Booneyard's identity, the detective said he had not, but other detectives on his team had discovered Booneyard's identity. No further evidence about Booneyard was adduced, and no evidence showed that Booneyard was Tarpley. In a first amended information filed on March 7, 2016, the People alleged

20

in counts 1 through 4 (the murder, attempted murder, and two robbery counts) that each defendant personally used a firearm (§ 12022.53, subd. (c)), and that each defendant personally discharged a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d).)

2. Defendants' First *Brady* Motion

On April 20, 2016, Shoulders filed a motion to dismiss the information or the firearm allegations, based on section 995 and the prosecution's alleged *Brady* violation in failing to turn over a September 29, 2015 ballistics report until March 15, 2016. (*Stanton v. Superior Court* (1987) 193 Cal.App.3d 265, 269-271 [*Brady* obligation to disclose material evidence favorable to the defense applies to preliminary hearings; breach of prosecution's *Brady* obligation in connection with a preliminary hearing can be raised in a nonstatutory motion to dismiss]; *People v. Gutierrez* (2013) 214 Cal.App.4th 343, 348-349 [same].) Nedd joined the motion.

The ballistics report showed that all of the bullet casings found at the crime scene, with exception of one shotgun shell, were fired from the same, unknown weapon. Shoulders's previous counsel had specifically asked the prosecution for the ballistics report, but it was not provided to the defense until March 15, 2016, after the February 29, 2016 preliminary hearing. Shoulders's counsel argued that the ballistics report was material, both because it impeached Richard F.'s August 7, 2015 interview statements and because it was exculpatory of Shoulders in that it indicated that Shoulders was not armed with a handgun and did not shoot Richard F.

21

As stated, Richard F. testified at the preliminary hearing that the dark-skinned man was armed and fired a handgun, but he was unsure whether Shoulders or Nedd were armed, except for when Shoulders grabbed Richard F.'s shotgun. During his earlier, August 7, 2015 interview, Richard F. said that both Shoulders and the cohort were armed with Glock-type handguns, both of them fired their handguns, and Shoulders was the one who shot him. Shoulders's counsel argued that the ballistics report, together with Richard F.'s preliminary hearing testimony, showed that the "unknown dark-skinned African American male . . . fired [all of the] shots from the handgun." Thus, Shoulders's counsel argued that Shoulders was deprived of his due process rights at the preliminary hearing because he was unable to impeach Richard F.'s August 7 statements with the ballistics report.

On May 4, 2016, the prosecution filed an opposition to the motion, including a declaration from the preliminary hearing and trial prosecutor, J.W. J.W. explained that the case was originally assigned to another prosecutor, T.H., around August 11, 2015, and was reassigned to J.W. on January 26, 2016. J.W. received the case file on January 29, and he did not learn of the ballistics report until March 9, when Shoulders's counsel asked him whether it existed or had been completed. At that time, J.W. asked the case agent and lead investigating officer, Detective A.S., to look into the ballistics report. On March 15, J.W. received the ballistics report and provided it to the defense.

In its opposition, the prosecution argued that the ballistics report was not material, at least for purposes of the preliminary hearing, because the handgun from which all of the shell casings were fired was not found, and the ballistics report did not show that

22

Shoulders was not the person who fired all of the shots from that unknown handgun. Alternatively, the prosecution argued that Shoulders could have fired a revolver, which would not have emitted shell casings, or he could have fired a second handgun and picked up all of the shell casings emitted from that handgun. The number of recovered shell casings also approximated the number of shots that Richard F. claimed were fired during his August 7 interview. Thus, the prosecution argued, the ballistics report would not have affected the outcome of the preliminary hearing.

At an assignment calendar conference on May 6, 2016, the parties announced they were ready for trial, and the trial date was confirmed for May 9. On May 9, Shoulders's counsel filed a supplemental declaration in support of her motion to dismiss the information or the firearm allegations. Shoulders's counsel explained she had made multiple requests to J.W. "for any information regarding the death of Rayvon Tarpley, who some evidence indicates could be the unknown short, bald black male described by [Richard F.] at the preliminary hearing as the shooter." Tarpley died of a self-inflicted, accidental gunshot wound on September 22, 2015. In December 2015, T.H. provided defense counsel with discovery, but that discovery did not include any recordings or police reports concerning any interviews with a witness named Glen Blackman.

Shoulders's counsel further explained that J.W. had looked into the matter of the Tarpley death investigation, law enforcement officers had indicated to J.W. that there may be recordings of Blackman interviews, and counsel had asked J.W. for those recordings. Shortly after the preliminary hearing, Shoulders's counsel and J.W. met in J.W.'s office and watched part of a video recording of a Nedd interview in which

23

detectives told Nedd that Tarpley had "made statements about his culpability in the charged offenses." J.W. believed this information about Tarpley making inculpatory statements about his involvement in the August 6, 2015 incident could have been a lie or a ruse, but he texted a detective about the issue and said he believed that any interviews regarding Tarpley were conducted by detectives who were not involved in the investigation of the August 6 incident.

On May 5, 2016, J.W. went to "the homicide office" and asked for all of the discovery law enforcement officers had on their computers concerning this case. On May 6, J.W. gave the defense "a large amount of discovery" that he had obtained from the homicide office on May 5. "Most notably," Shoulders's counsel continued, the May 6 discovery included a folder of audio interviews conducted by Detective T.M., including a never-before disclosed audio-recorded interview of Blackman.[13] In this Blackman interview, Blackman said that Tarpley showed him a news article about the August 6, 2015 shootings in this case and, in reference to the article, said over and over again that he had " 'fucked up' " and " 'had to shoot someone.' " The defense had not received any contact information for Blackman. Shoulders counsel argued that Tarpley's statements to Blackman, together with the ballistics report, showed that Shoulders never used nor discharged a firearm in this case.

---

[13] Shoulders's counsel also explained that, as she was continuing to review the May 6 discovery on Sunday, May 8, 2016, she "came across another September interview" of Blackman, conducted by Detective A.S. It was later shown that Detectives A.S. and T.M. did not separately interview Blackman; they interviewed Blackman together on September 23, 2015.

On Monday, May 9, 2016 the court (Hon. Lisa M. Rogan) found a *Brady* violation in the prosecution's failure to timely turn over the ballistics report and the Blackman interview before the preliminary hearing, and it granted defendants' dismissal motion in part by dismissing the firearm allegations as a remedy for these *Brady* violations. The court reasoned that no evidence adduced at the preliminary hearing showed that Nedd had used or discharged a firearm in the commission of the robberies at Richard F.'s apartment, and the subsequently produced ballistics report and Blackman interview showed that Shoulders also did not use or discharge a firearm.

Pretrial proceedings continued on May 10, 2016. In discussing a motion in limine to exclude Nedd's September 30, 2015 interview statements, J.W. explained that Nedd claimed in his August 7 interview that he did not know Booneyard, but during a second, September 30 interview, Nedd admitted that Booneyard was Tarpley and that Tarpley was Nedd's brother-in-law. Shoulders's counsel added that, according to Detective A.S.'s recently disclosed police report about the Blackman interview, Tarpley told Blackman that he, Tarpley, did not know Shoulders.

On May 10, 2016, the court (Hon. Victor R. Stull) found a second *Brady* violation in the prosecution's failure to timely turn over portions of the detectives' August 7, 2015 interview with Shoulders, in which Shoulders denied he was at Richard F.'s apartment on August 6. As a remedy for this *Brady* violation, the court ruled that the prosecution could not use any of Shoulders's August 7 interview statements, including for impeachment purposes if Shoulders testified.

25

As a remedy for the late disclosure of the Blackman interview, J.W. offered to stipulate to the admission of Tarpley's statements to Blackman, through Detective A.S.'s trial testimony about his September 23 interview with Blackman. The court pointed out that this stipulation would "serve justice and that's what I'm interested in." But Shoulders's counsel argued that the charges should be dismissed based on the prosecution's *Brady* error in failing to timely disclose the Blackman interview. The court expressly found that the prosecution committed a *Brady* violation in failing to timely disclose the Blackman interview but directed the parties to brief whether a dismissal of the charges, with prejudice, was an appropriate sanction for *this Brady* violation.

3. The Second *Brady* Motion

On May 11, 2016, Shoulders's counsel filed a second or supplemental *Brady* motion to dismiss the charges, with prejudice, based on the prosecution's failure to disclose the Blackman interview until May 6. Nedd joined the motion. In this motion, Shoulders's counsel explained that, as she was continuing to review the May 6 discovery during the afternoon of May 9, she found a police report concerning Detective A.S.'s September 23, 2015 interview with Blackman. The report indicated that Tarpley *also* told Blackman that he, Tarpley, "hoped the guy who already had been arrested" did not "tell on" Tarpley, and that " 'the male the police had to "catch" just ran.' " Tarpley also told Blackman that he shot " 'the dude in the ribs.' " The May 6 discovery also revealed that three detectives involved in investigating the August 6 incident, Detectives J.L., T.M. and A.S., were involved in interviewing Blackman. Detective J.L. had investigated Tarpley's death. On May 9, Detective A.S. gave Nedd's counsel two addresses and a

26

phone number for Blackman, but Nedd's defense investigator had since been unable to locate Blackman.

On May 17, 2016, the prosecution filed an opposition to the May 11 *Brady* dismissal motion. The opposition stated the People were "already humbled and regretful for the two negligent *Brady* errors found so far"—for the late disclosures of the ballistics report and portions of the August 7 Shoulders interview—and admitted a "third discovery error—late disclosure of the Glenn Blackman interview." The prosecution claimed that the late disclosure of the Blackman interview was not a *Brady* violation and, even if it was, California law did not permit a case to be dismissed with prejudice as a remedy for the violation, under the circumstances.

With supporting declarations from J.W., T.H., and Detective A.S., the prosecution explained why it failed to timely disclose the Blackman interviews: Different "DR" case numbers and different investigating teams were assigned to the Tarpley death investigation and the Julian K. murder investigation, and the reports for the two investigations were not cross-referenced to each other. Detectives J.L and S.T. were assigned to investigate Tarpley' September 22, 2015 death. Detective J.L.'s September 29, 2015 report for the Tarpley death investigation did not include any written witness statements and was not cross-referenced to the "DR" case number for Julian K.' s murder.

Detective J.L. interviewed Blackman on September 23, 2015, as part of the Tarpley death investigation. Later the same day, Detectives T.M. and A.S., who were investigating Julian K.'s murder, contacted Blackman and interviewed him together. In

27

this interview, Blackman reiterated that Tarpley told Blackman that Tarpley had " 'fucked up' " and " 'had to shoot someone' " during the August 6, 2015 incident at Richard F.'s apartment. Detective A.S. wrote a supplemental report about his and Detective T.M.'s September 23 Blackman interview for the Julian K. murder investigation.

Detective A.S. forwarded his supplemental report to the original prosecutor, T.H., together with the detective's September 23 Blackman interview, as attachments to a December 8, 2015 e-mail to T.H. T.H. received the e-mail during her lunch break on December 8, but she did not recall reading the attachments, she forgot about the e-mail, and she did not "process" the e-mail "into discovery" in this case, print the e-mail, or save the e-mail to her computer files related to this case. T.H. also did not provide any of the Blackman-related discovery to J.W. when the Julian K. case was reassigned to J.W. in January 2016.

When asked by Nedd's counsel in April 2016 for further discovery concerning the Tarpley death investigation, J.W. asked Detective A.S. for the "Tarpley death reports" or "Tarpley death interviews," and Detective A.S. gave J.W. a report from the Tarpley death investigation. But this report did not contain any Blackman interviews. "Only when [J.W.] obtained a thorough harvesting of [Detective A.S.'s] computer on May 5 and 6, 2016, did [J.W.] first obtain a report of [Detective A.S.'s] Blackman interview." Because Detective A.S. had provided this information to T.H. in December 2015, Detective A.S. thought that J.W. had the Blackman interview and was asking for "Tarpley death materials."

28

Nedd's defense investigator, S.S., spoke with Blackman by telephone on May 9, 2016. S.S. drove to an address in Adelanto, which the prosecution had provided as Blackman's last known address. There, S.S. spoke with Blackman's uncle, who confirmed that Blackman had lived there but had moved away shortly after Tarpley's death. Later that evening, Blackman called S.S. by telephone, but S.S. did not record the conversation.

During their May 9, 2016 conversation, Blackman told S.S. that he did not know anything about the Julian K. case and claimed that Tarpley's statements to him were about something that Tarpley had done several months before the August 6, 2015 incident. Blackman agreed that S.S. could call him the next day and record the interview. But when S.S. called and spoke to Blackman on May 12, Blackman was "evasive" and continued to say that Tarpley had been talking about another incident. Blackman also told S.S. that he did not want to testify in the Julian K. case because he did not know anything about it. He also told S.S. that he was living in different places in Riverside and was working at an auto parts store in Riverside. But the parties soon discovered that Blackman had never worked at the auto parts store.

Based on Blackman's reluctance to testify, the People argued in its opposition that the charges should not be dismissed as a remedy for its untimely disclosure of the Blackman interviews. The People argued that they had not "suppressed" the Blackman interviews because they disclosed them before trial and, in any event, the late disclosure did not prejudice defendants. Given Blackman's unwillingness to testify, the People argued there was "no guarantee or even likelihood" that, if Blackman were found, he

would testify "beneficially, completely, or truthfully for either defendant." And, even if Blackman testified truthfully, defendants would still be liable for Julian K.'s murder under a (then-applicable) felony-murder theory. The People further argued that the case law did not support dismissing the charges, with prejudice, under these circumstances. The People were still trying to locate Blackman in order to serve him with a subpoena to testify.

On May 17, 2016, Shoulders's counsel filed a supplemental declaration in support of her second *Brady* motion. She stated that the investigating detectives had committed intentional and flagrant *Brady* violations in this case. For example, Detective A.S. had written and turned over a police report, stating there were three sets of latent fingerprints on the exterior of Nedd's vehicle, and that those prints belonged to Nedd, Shoulders, and M.W. But the fingerprint examiner's report, which was attached to the detective's report, stated that four sets of prints were found, and that the fourth set belonged to Tarpley. In addition, some of Nedd's September 30, 2015 interview statements to Detective M.F. concerning Tarpley's death were omitted from Detective M.F.'s October 1, 2015 report of that interview. Other discovery omissions were also detailed. Shoulders's counsel argued that the investigating detectives' discovery violations were "egregious and flagrant" and had "irreparably tainted" Shoulders's ability to receive a fair trial. Thus, she asked the court to dismiss the charges.

On May 18, 2016, the court conducted further proceedings on the second *Brady* motion. That morning, the prosecution gave the defense additional discovery concerning the Tarpley death investigation, namely, 25 to 26 audio recordings of witness interviews,

30

including approximately four hours of Blackman interviews. Shoulders's counsel noted that the prosecution had produced a lot of discovery since the parties announced ready for trial on May 6, and that there had been "partial police reports, police reports that were never written, [and] audios that cut off." She argued that the People and the detectives had been reckless in honoring their discovery obligation, and that dismissing the charges, with prejudice, was the appropriate remedy for their third *Brady* violation in failing to timely produce all discovery concerning the Blackman interviews. The People conceded there had been "misunderstandings" and "a lack of coordination" between the prosecution and the detectives but argued that none of the discovery violations were intentional and, in any event, the case law did not allow a dismissal with prejudice as a remedy for a pretrial *Brady* violation.

On May 18 and 19, 2016, the court heard extensive testimony from T.H., Detective M.F., and Detective A.S. concerning the various items of late discovery, including the Blackman interviews. All of this testimony showed that the detectives and the prosecution did not intentionally withhold any discovery.

Regarding the Blackman interviews, Detective A.S. explained that he learned of the Tarpley death investigation on September 23, 2015. He notified his sergeant that Tarpley was a possible suspect in the Julian K. murder because Tarpley's fingerprints had been found on Nedd's vehicle. He contacted the detectives involved in the Tarpley death investigation and told them that Tarpley was a suspect in the Julian K. case. After these detectives told him that Tarpley had made some incriminating statements to Blackman, Detectives A.S. and T.M. interviewed Blackman, and Detective A.S. wrote a report about

31

the interview for the Julian K. murder investigation. Detective A.S. sent his report and the Blackman interview to T.H. on December 8, 2015.

Detective A.S. further testified that J.W. came to the detective's office on May 5, 2016 and asked for all discovery related to the Julian K. case. On May 5-6, the detective gave J.W. several discs which included an audio of the detective's September 23, 2015 Blackman interview. Around May 6-8, 2016, the detective and J.W. compared the contents of their evidence binders in the Julian K. case, "page by page." The detective then realized that J.W. did not have a copy of the detective's report of his September 23 Blackman interview, or the Blackman interview, in J.W.'s evidence binder. On May 9, J.W. made a copy of the detective's report of the Blackman interview from the copy in the detective's evidence binder.

On May 19, 2016, after T.H. and Detectives M.F. and A.S. testified, the court heard arguments from counsel. The court agreed that the Blackman interview was material, and the focus turned to the appropriate remedy for its late disclosure. Shoulders's counsel argued that the only appropriate remedy was to dismiss the charges with prejudice because defendants could no longer receive a fair trial given Blackman's unavailability to testify for the defense. But Shoulders's counsel could not point to a case in which the charges were dismissed, with prejudice, for a *Brady* violation that was discovered before trial; the *Brady* cases generally dealt with material evidence that had not been disclosed until during trial.

The prosecution argued that, although the case involved "a pile up of discovery negligence," none of the discovery violations had been malicious or flagrant; rather, they

32

had all been inadvertent, and the prosecution and the detectives had tried to remedy them as soon as they knew about them. The prosecution also emphasized that Tarpley's statements to Blackman were not exculpatory of defendants because they did not absolve defendants of liability for Julian K.'s murder based on a felony-murder theory. The prosecution also argued that any prejudice the defense would suffer due to Blackman's unavailability was not attributable to the prosecution's late disclosure of the Blackman interview. Blackman was "actively avoiding" the case; thus, it was not reasonably probable that he would be cooperating with the defense even if the defense could locate him.

The court ruled that it was inappropriate to dismiss the charges with prejudice because, although the discovery violations had been negligent and "disturbing," they were not "flagrant" or "grossly shocking." The court then granted the People's motion to dismiss the first amended information, without prejudice, and to immediately file a felony complaint alleging the same charges. On May 19, 2016, the People dismissed the first amended information, without prejudice, and filed a felony complaint alleging the same charges. Following a second preliminary hearing, the People filed a new information on June 21. A new trial date was confirmed for July 26.

4. The Third *Brady* Motion

On July 26, 2016, Shoulders's counsel filed a third *Brady* motion to dismiss the charges. In addition to the previously delayed discovery, counsel explained that she had received several additional items of delayed discovery shortly after the case was refiled,

and that her office had served Blackman with a subpoena, but he failed to show up in court and had disappeared. Nedd joined the motion.

At a hearing on the motion, Shoulders's counsel advised the court that she had received all additional discovery by June 9, 2016. It included a supplemental report of an interview of Richard F. conducted on June 7; a "We Tip" report in which someone called the police on August 7, 2015, implicating two suspects other than defendants in the August 6, 2015 shootings; and a report regarding the firearm Tarpley used to shoot himself. Counsel's main concern was that she still could not find Blackman. She argued that, because Blackman was interviewed in September 2015 after Tarpley shot himself, he may have been available to the defense had the defense known of him at that time. Moreover, in February 2016, Blackman gave an address to the Department of Motor Vehicles where a relative of his lived, and the defense may have been able to locate him at that time but for the prosecution's late disclosure of his identity.

The prosecutor responded that the People had already been sanctioned for their discovery violations by the dismissal of the first amended information, without prejudice, which had given the parties plenty of additional time to find Blackman. Further, on July 1, 2016, a defense investigator spoke with Blackman over the telephone. Also, in July 2016, the investigator tried to serve Blackman at an address in Adelanto with a subpoena to appear a trial. When the investigator knocked on the door, he could hear movement, but no one answered. Thus, the prosecutor argued, there was nothing to indicate that Blackman would have been more cooperative had the defense tried to secure his appearance at trial any sooner. The prosecutor added that his office had tried every

34

possible means available to find Blackman. For several days, bureau of investigations personnel had surveilled his last known address, and SWAT and homicide detectives had also looked for him. The court continued the matter for further consideration.

When the discussion resumed, Shoulders's counsel detailed several documents she had received between May 19 and June 2, 2016: (1) additional interviews of Blackman, (2) discovery related to the Tarpley death investigation, (3) the "We Tip" report, (4) a new report regarding Shoulders's interview, (5) additional audio of that interview, and (6) a police report regarding an interview with one of Julian K.'s neighbors, T.S., in which T.S. stated that she saw a bald man (the cohort) with his hand extended toward Julian K. when Julian K. was shot. The prosecutor again explained the reasons for the earlier delays, as set forth in his pleadings and at the evidentiary hearing.

Regarding the new discovery material, the prosecutor stated that after the case was dismissed, he sent an e-mail to law enforcement, again asking them for all of the discovery in the case and to contact other witnesses so the defense had full discovery. When the prosecutor received the new evidence binders from law enforcement, they contained 33 or more compact discs. The additional recordings regarding Blackman were never on the sheriff's department's shared drive; they were only filed under the Tarpley investigation. Shoulders's interview was reconstructed based on a second set of recordings that the interviewing detective acquired from another officer. The prosecutor received those recordings after the May 19, 2016 dismissal of the information, and turned them over to the defense. Additional reports were written and included with the new

discovery because the detectives listened to every possible recording and wrote reports regarding each of them.

The court denied the renewed *Brady* motion to dismiss the charges. The court stated that any delayed disclosure was negligent but did not come "anywhere close to . . . flagrant" misconduct nor did it constitute "outrageous government conduct." Regarding Blackman, the court noted it had already provided a remedy by dismissing the firearm allegations against defendants. Although the recent efforts to locate Blackman were unsuccessful, there was nothing to indicate that, had the defense learned of Blackman's existence earlier, he would have been found and cooperated with the defense. Because there was no link between the delay in disclosing the Blackman interviews and Blackman's disappearance, the court concluded there was no basis for a dismissal with prejudice for the alleged *Brady* violation in failing to earlier disclose Tarpley's statements to Blackman and Blackman's identity.

5. The Motion to Dismiss Based on the Prosecution's Alleged Sixth Amendment Violation for Failing to Earlier Disclose Tarpley's Statements to Blackman

Around one week later, Shoulders's counsel filed a separate motion to dismiss the charges on the ground Shoulders was denied his Sixth Amendment right to due process and a fair trial based on the prosecution's delay in disclosing the Blackman interviews. The motion focused on the prosecution's delayed disclosure of Tarpley's statements to Blackman. In a supporting declaration, Shoulders's counsel reiterated the circumstances surrounding the prosecution's delay in disclosing the Tarpley/Blackman information and

stated that neither the defense nor the prosecution had been able to locate Blackman to secure his testimony for trial.

In a written opposition, the prosecutor recounted the procedural history regarding the Blackman interview discovery error. The prosecutor added that after he refiled the case, he again gave the defense records containing contact information for Blackman and, on June 2, 2016, provided a supplemental copy of all discovery. Defense investigators for both Shoulders and Nedd spoke with Blackman in May 2016, and Shoulders's defense investigator had another conversation with him on July 1. In that conversation, Blackman asked the defense investigator why he was being subpoenaed and then hung up on him. Thus, the defense had the benefit of statements Blackman made to investigators in May. Moreover, during those interviews, Blackman was dishonest about his current location, residence, and place of employment, and he refused to comply with a subpoena. The prosecution made its own attempts to locate Blackman but was unsuccessful. Thus, Blackman's absence was not attributable to action on the part of the government but, rather, to Blackman's own unwillingness to cooperate.

At an evidentiary hearing on the motion, Detective A.S. recounted the details of the interview he had with Blackman on September 23, 2015—the night after Tarpley shot himself to death—and the fact that he provided the interview to T.H. in December 2015. He also testified to the confusion surrounding the prosecutor's many requests for the "Tarpley death investigation," and the discovery of that confusion when he and the prosecutor were comparing their evidence binders before trial on May 6, 2016. He further testified that, after the case was dismissed and refiled, he provided a new binder to

37

the prosecutor. It included compact disks and an investigative report of the Blackman interview, which contained a confidential witness address and information page. The detective tried to find additional contact information for Blackman. He had members of the specialized enforcement division conduct surveillance at locations Blackman was known to frequent. After Blackman told a defense investigator that he worked at an auto parts store in Riverside, the detective had the sheriff's department attempt to locate Blackman at the auto parts store, but sheriff's deputies learned he had never worked there. To the detective's knowledge, no member of law enforcement had been able to contact Blackman since his interview on September 23, 2015.

Detective J.L., who interviewed Blackman in connection with the Tarpley death investigation, testified that there were two interviews of Blackman—one on September 22, 2015 and another on September 23. It was during the September 23 interview that Blackman made the statements regarding his conversation with Tarpley. Blackman was reluctant to talk to the detective but admitted he had been dishonest in some respects, and Blackman asked the detective not to put the interview "on paper." The detective did not arrest Blackman and did not write a report because separate interview reports are not prepared in death investigations when the death did not occur under suspicious circumstances. At the time of the interview, the detective had an address and cell phone number for Blackman. But the detective did not think he would need to talk to Blackman again about Tarpley's death.

After extensive argument by counsel, the court denied the renewed motion to dismiss the newly filed, May 19, 2016 information. The court reasoned there was no

38

relationship between Blackman's disappearance or unavailability for trial and law enforcement's discovery delays that would impose a duty upon law enforcement to ensure that Blackman was available for trial. Further, although Blackman's testimony was important or material to the defense, it was doubtful that Blackman would have appeared in court if he had been served with a subpoena earlier. Finally, the defense had had Blackman's contact information since May 6, 2016, which gave the parties ample time to locate Blackman if that were possible. Thus, the court found there was no due process violation warranting dismissal of the charges with prejudice.

B. *Defendants' Claims of Brady Error*

    1. <u>Legal Principles and Standard of Review</u>

"The *Brady* rule is based on the requirement of due process. Its purpose is . . . to ensure that a miscarriage of justice does not occur." (*United States v. Bagley* (1985) 473 U.S. 667, 675.) "Under *Brady*, *supra*, 373 U.S. 83, and its progeny, the prosecution has a [Fourteenth Amendment] constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence." (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.) The prosecution's duty of disclosure extends to evidence "known only to police investigators" (*Kyles v. Whitley* (1995) 514 U.S. 419, 437-438) and is not contingent upon whether the defense requests the evidence. (*United Sates v. Agurs (*1976) 427 U.S. 97, 107; *In re Brown* (1998) 17 Cal.4th 873, 879.) "[T]he suppression of evidence that is materially favorable to the accused violates due process regardless of whether it was intentional, negligent, or inadvertent." (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1225.)

But "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs*, *supra*, 427 U.S. at p. 108.) "[A]lthough 'the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material" '—'strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 51, quoting *Strickler v. Greene* (1999) 527 U.S. 263, 281-282; accord, *People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043.)

"There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene*, *supra*, 527 U.S. at p. 282; *People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.) Thus, there is no true *Brady* error unless there is also resulting prejudice. (*In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 7; see *United States v. Bagley*, *supra*, 473 U.S. at p. 678.)

"Prejudice, in [the *Brady*] context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the

40

outcome of the trial' [citation].  A defendant instead 'must show a "reasonable probability of a different result." ' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." (*People v. Jenkins* (2000) 22 Cal.4th 900, 954.)

We review claims of *Brady* error de novo.  (*People v. Salazar*, supra, 35 Cal.4th at p. 1042.)  Our de novo review extends to conclusions of law and mixed questions of law and fact related to the claim of *Brady* error, but the trial court's findings of fact are entitled to great weight if supported by substantial evidence.  (*Ibid*.)

2.  Analysis

Defendants claim that the prosecution committed *Brady* error in failing to timely disclose "the Tarpley/Blackman information," that is, Tarpley's statements to Blackman that Tarpley "fucked up" and "had to shoot someone" at Richard F.'s apartment on August 6, 2015.  We agree that the Tarpley/Blackman information was favorable to defendants, but we also conclude that the prosecution's failure to disclose the information until May 6, 2016 was not prejudicial to defendants.

The information was favorable to the defense for two reasons:  it tended to impeach Richard F.'s pretrial statements and February 2016 preliminary hearing testimony, and it was exculpatory of defendants' intent to shoot and kill anyone.  (*Strickler v. Greene*, *supra*, 527 U.S. at pp. 281-282; *Comstock v. Humphries* (9th Cir. 2015) 786 F.3d 701, 708 ["[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is, by definition, favorable."].)  The information tended to impeach

Richard F.'s August 7, 2015 statement that only two people were involved in the robberies and shootings because it showed that three people were involved. It was also impeaching of Richard F.'s February 2016 preliminary hearing testimony that *Shoulders* was the person who shot Richard F. because it indicated that Tarpley was the only shooter.

The information was exculpatory because it tended to show that defendants and Tarpley did not have a prearranged plan, or engage in any conspiracy, to shoot and kill anyone at Richard F.'s apartment. Thus, the information tended to show that defendants did not *directly* aid and abet Tarpley in committing the murder of Julian K. or the attempted murder of Richard F. (*Gentile*, *supra*, 10 Cal.5th at p. 850 [A direct aiding and abetting theory requires that the aider and abettor "know and share the murderous intent of the actual perpetrator."].)

Still, the information was not material to either defendant's guilt of the charged offenses, and its absence at trial did not prejudice either defendant. Defendants were convicted of (1) the first degree residential robberies of Julian K. and Richard F. (counts 3 & 4); (2) the first degree murder of Julian K. (count 1), based on alternative theories of felony murder (the murder occurred during the commission of a robbery), and that the murder was a natural and probable consequence of either a robbery or a first degree residential burglary; and (3) the attempted murder of Richard F. (count 2), based on the theory that the attempted murder was a natural and probable consequence of a robbery.

At trial, the prosecution did not claim that either defendant shot Julian K. or Richard F., or that either defendant personally used or personally discharged a firearm in

42

the commission of the robberies. Richard F. testified that he did not see a gun in Nedd's hand when Nedd ran into the apartment, and he also did not see that Shoulders had a gun other than when Shoulders wrestled Richard F.'s shotgun from Richard F.'s hands. All of the trial evidence showed that the cohort, Tarpley, who was referred to at trial as "the bald man," shot and killed Julian K. and shot and wounded Richard F. The Tarpley/ Blackman information was consistent with, but would have added nothing material to, the trial evidence because it also showed that Tarpley was the only shooter.

Thus, if presented at trial, the Tarpley/Blackman information would not have "put the whole case in such a different light as to undermine confidence in the verdict[s]." (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 434-435.) Defendants were properly convicted in counts 1 through 4 based on the applicable law at the time of trial in 2016. Ample evidence showed that defendants and Tarpley went to the apartment with the intention of robbing its occupants of the marijuana, the shootings occurred during the commission of the robberies, and the shootings were a natural and probable consequence of the robberies. Indeed, after Shoulders left the apartment the first time and told Nedd that Richard F. had a shotgun, defendants picked up Tarpley and returned to the apartment with Tarpley, who was armed with a handgun. Neither defendant tried to stop Tarpley when he walked into the apartment, holding a handgun to Julian K.'s ribs. Additionally, Tarpley's statement to Blackman that he "fucked up" and "had to shoot someone" arguably supported the prosecution's theory that defendants conspired with Tarpley to rob the apartment's occupants of the marijuana.

Defendants maintain that the Tarpley/Blackman information was material and that its late disclosure on May 6, 2016 was prejudicial to them.  They argue it is reasonably probable that the defense would have been able to "statementize" Blackman and secure his testimony at trial, if the Tarpley/Blackman information had been provided to the defense in October 2015, when other discovery was provided, or before the February 2016 preliminary hearing.  They argue it is speculative to assume that Blackman would not have cooperated with the defense, had the defense known about him and been able to subpoena him before February 2016.  They point out that materiality, in the *Brady* context, "includes consideration of the effect of the nondisclosure on defense investigations and trial strategies." (*People v. Maciel* (2013) 57 Cal.4th 482, 551.)  Again, however, the Tarpley/Blackman information was neither material to either defendant's guilt of the charged offenses nor prejudicial to the juries' verdicts.  Thus, there was no true *Brady* error or violation in the prosecution's failure to earlier disclose the Tarpley/Blackman information.

Lastly, defendants claim that *United States v. Chapman* (9th Cir. 2008) 524 F.3d 1073 (*Chapman*) requires reversal of their convictions.  The *Chapman* court upheld the district court's dismissal of an indictment as the only appropriate remedy for the prosecutor's "flagrant" *Brady* violations during trial and as a proper exercise of the district court's discretionary supervisory powers. (*Id*. at pp. 1084-1088 & fn. 5.)  The prosecutor in *Chapman* failed to turn over material impeachment evidence to the defense until after the government's witnesses had testified at trial and were excused; then the prosecutor lied to the district court that he had given the impeachment evidence to the

44

defense before trial when in fact he had not.  (*Id*. at pp. 1078-1080.)  The district court found that the prosecutor acted " 'flagrantly, willfully, and in bad faith,' " that the defendants would be prejudiced by a new trial, and that no lesser sanction than dismissal could adequately remedy the harm done.  (*Id*. at p. 1084.)

In upholding the dismissal order, the *Chapman* court noted that the defendants had been prejudiced by the prosecutor's conduct, and that the district court did not abuse its discretion in concluding that dismissal was the only appropriate remedy.  (*Chapman*, *supra*, 524 F.3d at p. 1087.)  The district court "considered and properly rejected" the government's argument that a mistrial was an adequate remedy for the prosecutor's discovery violations because a retrial of the charges would "advantage the government" by allowing it to "salvage what the district court viewed as a poorly conducted prosecution."  (*Ibid*.)

Defendants argue that the prosecution's multiple *Brady* errors here, like the *Brady* errors in *Chapman*, were "flagrant" and, as such, merit reversal and dismissal of defendants' cases.  We disagree.  The dismissal of charges as a sanction for prosecutorial misconduct or *Brady* errors is a " 'drastic' " and " 'disfavored' " remedy in the federal courts.  (*People v. Uribe* (2011) 199 Cal.App.4th 836, 880-881; *United States v. Jacobs* (9th Cir. 1988) 855 F.2d 652, 655.)  The federal courts' supervisory powers doctrine has no application in our state courts (*People v. Uribe*, at p. 879); but, even if it did, the facts of this case do not justify a dismissal.

The dismissal remedy is proper in the federal courts only if:  (1) the *Brady* errors were " 'flagrant,' " (2) the Brady errors resulted in substantial prejudice to the defendant,

45

and (3) no lesser sanction would cure the prejudice. (See *United States v. Jacobs*, *supra*, 855 F.2d at p. 655; *People v. Uribe*, *supra*, 199 Cal.App.4th at pp. 879-881.) These factors were present in *Chapman* but are not present here. Here, the trial court found, and substantial evidence shows, that the prosecution's various *Brady* errors were negligent but not "flagrant." And, for the reasons explained, defendants were also not prejudiced by the late disclosure of the Tarpley/Blackman information, the only late discovery that defendants claim was material to their defense. Lastly, the dismissal of the firearm allegations, before trial, remedied any prejudice that the late disclosure of the Tarpley/Blackman information could have caused defendants.

## C. *Defendants' Additional Due Process Claim*

Defendants further claim that the trial court erroneously denied their separate motion to dismiss the charges based on the prosecution's alleged violation of their Sixth Amendment rights to confront and cross-examine witnesses, and "to have compulsory process of obtaining witnesses in [their] favor." (U.S. Const., Amend. 6.) California case law establishes that, independently of *Brady* and its progeny, when the prosecution has wrongfully deprived a defendant of the opportunity to secure the presence of a "material" witness whose testimony might prove the defendant's innocence, the defendant is entitled to a dismissal of the charges. (*Bellizzi v. Superior Court of Stanislaus County* (1974) 12 Cal.3d 33, 36 (*Belizzi*); *People v. Kiihoa* (1960) 53 Cal.2d 748, 754 (*Kiihoa*); *Harris v. Superior Court* (1973) 35 Cal.App.3d 24, 26-27 (*Harris*).) This principle is based on the rationale that the prosecution's conduct in failing to timely disclose the identity of a material witness, which results in the witness's unavailability to testify, deprives the

46

defendant of his or her due process right to a fair trial. (*Harris*, *supra*, 35 Cal.App.3d at pp. 26-27.) But this principle or doctrine is limited to situations in which the prosecution is responsible for the witness's unavailability. (See *Id.* at pp. 26-27 and cited cases; *People v. Rance* (1980) 106 Cal.App.3d 245, 253-254 (*Rance*) and cited cases.) Here, the prosecution is not responsible for Blackman's unavailability to testify at trial.

*Bellizzi* illustrates this limitation on the prosecution's responsibility to secure the availability of evidence or witnesses material to the defense. The defendant in *Bellizzi* was charged with selling heroin to a paid police informant. (*Bellizzi*, *supra*, 12 Cal.3d at p. 35.) Before trial, the prosecution disclosed the name of the informant and made him available to the defense for pretrial examination, but the prosecution did not disclose the informant's address due to a concern for his safety. (*Id.* at p. 36.) The court granted the defendant's motion to dismiss the charges in the interest of justice. (§ 1385; *Bellizzi*, at p. 36.) Two days later, the prosecution refiled the charges. (*Id.* at p. 36.)

At the preliminary hearing on the refiled charges, the informant testified that he had purchased heroin from the defendant at the defendant's home one evening, and that a third person, Evans, was present in the home that evening but had temporarily left the home during the heroin sale. (*Bellizzi*, *supra*, 12 Cal.3d at p. 36.) After Evans learned that the charges against the defendant had been dismissed, Evans "left town" and could not be located. (*Ibid.*) The defendant petitioned for a writ of prohibition directing the trial court to dismiss the refiled charges, arguing that Evans's unavailability to testify as a witness at trial would deprive the defendant of his due process right to a fair trial. (*Id.* at pp. 36, 38.)

47

The *Bellizzi* court denied the petition, reasoning that Evans's unavailability was not the " 'inevitable' " result of any action or omission on the part of the People, including their act of refiling the charges. (*Bellizzi*, *supra*, 12 Cal. 3d. at p. 37.) Rather, Evans was the defendant's friend, and the defendant was the one who told Evans about the earlier dismissal of the charges, which ostensibly caused Evans to leave town. (*Ibid.*) *Bellizzi* reasoned that the defendant "had ample opportunity to ascertain Evans's future plans so that he [the defendant] could reach [Evans] in the event a trial ultimately were held." (*Ibid.*)

*Bellizzi* distinguished *Kiihoa* and *Harris* as involving the unavailability of police informants. The informant in *Kiihoa* was "in contact with, and under the control of, the prosecution" and in *Harris* the prosecution did not disclose the informant's identity until after the informant had "disappeared." (*Bellizzi*, *supra*, 12 Cal.3d. at p. 37 & fn. 2.) *Bellizzi* observed that "[t]he common sense rationale of *Kiihoa* and *Harris*, that the People must bear the responsibility of producing their own agents and informants, is inapplicable where, as in the instant case, the defendant has ample opportunity to assure *his* witness' presence at trial." (*Id.* at p. 37, fn.2, italics added.)

Defendants claim that *Kiihoa* and *Harris* are on point and controlling. They argue it is not determinative that *Kiihoa* and *Harris* involved informants who were under the government's " 'control.' " Rather, they argue, "what is determinative is whether the government's wrongful conduct, in the words of the *Bellizzi* court, deprived them of "ample opportunity to assure" Blackman's presence at trial. (*Bellizzi*, *supra*, 12 Cal.3d at p. 37, fn. 2.) We agree. Put another way, in cases not involving police informants, "only

48

some impropriety on the People's part which makes the witness unavailable may result in dismissal if the defendant would otherwise be deprived of a fair trial." (*Rance*, *supra*, 106 Cal.App.3d at p. 254.)

But under this standard, defendant's due process claim fails. Defendants had ample opportunity to secure Blackman's presence at trial on the refiled information, notwithstanding the prosecution's earlier failure to disclose the Tarpley/Blackman information and Blackman's identity, last known address, and other contact information until May 6, 2016. As discussed, the original information was dismissed on May 19 due to the prosecution's failure to earlier disclose the Tarpley/Blackman information. Trial on the new, refiled information was to begin on July 26.

A defense investigator spoke with Blackman on May 12, 13, and July 1, 2016. But Blackman made it clear to the defense investigator that he did not wish to testify at defendants' trial or cooperate with either the defense or the prosecution. Blackman lied to the defense investigator about his place of employment, ostensibly to throw the defense off his trail in serving him with a subpoena to testify. He also evaded the prosecution's extensive efforts to locate him. Thus, the prosecution's earlier discovery failures, including its late disclosure of the Tarpley/Blackman information, did not deprive defendants of an "ample opportunity" to assure Blackman's presence at trial. (*Bellizzi*, *supra*, 12 Cal.3d p. 37, fn. 2.) Nor was Blackman's disappearance the "inevitable" result of the prosecution's earlier failure to timely disclose the Tarpley/Blackman information and Blackman's identity and contact information. (*Id*. at p. 37.) The prosecution's impropriety in failing to timely turn over the Tarpley/Blackman

information did not result in Blackman's unavailability.  (*Rance*, *supra*, 106 Cal.App.3d at p. 254.)

## IV.  DEFENDANTS' OTHER CLAIMS OF ERROR

A.  *Defendants' Murder and Attempted Murder Convictions in Counts 1 and 2 Must Be Vacated and the Matter Remanded for a New Trial on Counts 1 and 2*

Defendants claim that their convictions for the first degree murder of Julian K. in count 1 and for the attempted premeditated murder of Richard F. in count 2 must be reversed and the matter remanded for a new trial on the murder and attempted murder charges, pursuant to Senate Bill 1437 (2017-2018 Reg. Sess.) and Senate Bill 775 (2020-2021 Reg. Sess.).  The People concede, and we agree, that this claim has merit.

1.  Defendants' Convictions Are Properly Challenged in this Direct Appeal

As we have noted, Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Gentile*, *supra*, 10 Cal.5th at p. 842.)  Before Senate Bill 775 was enacted, the Court of Appeal was split on whether Senate Bill 1437 applied to attempted murder as well as murder, with some courts holding that Senate Bill 1437 did not apply to attempted murder at all, others holding that it applied only prospectively to attempted murder, and still others holding that it applied both prospectively and retroactively to nonfinal attempted murder convictions.  (*People v. Harris* (2021) 60 Cal.App.5th 557, 565-567, review granted

50

Apr. 21, 2021, S267529; *People v. Love* (2020) 55 Cal.App.5th 273, 278-279 [summarizing split of authority as of Oct. 1, 2020].)[14]

But Senate Bill 775 resolved this split of authority by *clarifying* that Senate Bill 1437 applies to attempted murder and manslaughter as well as murder. (Stats. 2021, ch. 551, § 1, subd. (a).)[15] Senate Bill 775 specifically "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (*Ibid.*) Senate Bill 775 also amended section 1170.95 to provide that defendants convicted of murder, attempted murder, or manslaughter, "whose conviction[s] [are] not final may challenge on direct appeal the validity of [those] conviction[s] based on the changes made to Sections 188 and 189 by Senate Bill 1437 . . . ." (Stats. 2021, ch. 551, § 2; § 1170.95, subd. (g), eff. Jan 1, 2022.)

---

[14] On November 13, 2019, our Supreme Court granted review in *People v. Lopez* (2019) 38 Cal.App.5th 1087 on the question of whether Senate Bill 1437 applied to attempted murder liability under the natural and probable consequences doctrine (*People v. Lopez* (Nov. 13, 2019, S258175) 2019 Lexis 8414) but, following the October 5, 2021 enactment of Senate Bill 775 (Stats. 2021, ch. 551), the court transferred the matter back to the Court of Appeal, Second Appellate District, Division Seven, with directions to vacate its decision and reconsider the cause in light of Senate Bill 775 (*People v. Lopez* (Nov. 10, 2021, S258175) 2021 Lexis 776).

[15] Our Supreme Court held in *Gentile* that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile, supra,* 10 Cal.5th at pp. 851-852.) But by expressly authorizing defendants whose judgments of conviction are nonfinal to seek relief under Senate Bill 1437 on direct appeal (§ 1170.95, subd. (g), enacted by Stats. ch. 551, § 2), Senate Bill 775 has abrogated *Gentile*.

As a bill enacted during a regular legislative session, Senate Bill 775 does not become effective until January 1, 2022. (Cal. Const., art. IV, § 8, subd. (c)(1).) But, as the parties agree, Senate Bill 775 necessarily applies to this case because defendants will not have exhausted their appeal rights from their judgments of conviction and sentence before January 1, 2022. (*In re Estrada* (1965) 63 Cal.2d 740, 744-745 [absent evidence of a contrary legislative intent, "[i]t is an inevitable inference" that the Legislature intends ameliorative criminal statutes to apply to all cases not final when the statutes become effective]; *People v. Vieira* (2005) 35 Cal.4th 264, 306 [For purposes of determining the retroactive application of ameliorative amendments to a criminal statute, an appeal is not final until the time has passed for petitioning the United Stated Supreme Court for a writ of certiorari.]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973 [same]; *People v. Diaz* (2015) 238 Cal.App.4th 1323, 1336 ["For purposes of the *Estrada* rule, a judgment is 'not final so long as the courts may provide a remedy on direct review . . . ."].)

Thus, defendants may challenge the validity of their murder and attempted murder convictions in this direct appeal from their nonfinal judgments of conviction and sentence in counts 1 and 2, pursuant to Senate Bill 1437 as clarified by Senate Bill 775. (Stats. 2021, ch. 551, § 2.) Defendants are not required to petition the trial court to vacate their convictions pursuant to section 1170.95 because the legislative history of Senate Bill 775 plainly indicates that the Legislature intended a direct appeal challenge to the validity of a *nonfinal judgment* of conviction and sentence for murder, attempted murder, and manslaughter to be *an alternative* to filing a section 1170.95 petition. (Assem. Com. on Public Safety on Sen. Bill No. 775 (2020-2021 Reg. Sess.) amended July 6, 2021 ["[T]his

52

bill: [¶] . . . [¶] (1) (j) [s]tates that a person convicted of murder, attempted murder, or manslaughter, whose conviction is not final, may challenge the validity of that conviction on direct appeal *rather than via the petition.*" (Italics added.)].)[16]

2. Prejudicial Instructional Error Requires the Vacatur of Defendants' Murder and Attempted Murder Convictions and a New Trial on Counts 1 and 2

Defendants were convicted of the first degree murder of Julian K. in count 1 based on a felony murder theory that is no longer viable following the enactment of Senate Bill 1437. "[T]o amend the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e): 'A participant in the perpetration or attempted perpetration of [robbery, among other qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the

---

**16** Defendants claim the trial court erroneously denied their motions for a new trial on counts 1 and 2 based on the changes Senate Bill 1437 made to sections 188 and 189, effective January 1, 2019. The court in *People v. Thomas* (2021) 64 Cal.App.5th 924, held that persons (like defendants here) who are convicted before but sentenced after Senate Bill 1437 took effect on January 1, 2019 may challenge the validity of their convictions in a motion for new trial and are not limited to the "postjudgment retroactive remedy" of petitioning trial court to vacate their convictions pursuant to section 1170.95. (*Id*. at pp. 945-947.) But because Senate Bill 775 allows defendants to challenge the legal validity of their murder and attempted murder convictions in this direct appeal, it is unnecessary to address defendants' claim that the trial court erroneously denied their motions for a new trial based on Senate Bill 1437. Even if defendants had not moved for a new trial based on Senate Bill 1437, their challenges to the validity of their murder and attempted murder convictions are cognizable in this direct appeal from their nonfinal, August 23, 2019 judgments of conviction and sentence in counts 1 and 2.

underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' " (*Gentile*, *supra*, 10 Cal.5th at p. 842.)

Defendants were not prosecuted as the actual killers of Julian K. Rather, they were prosecuted in 2018 based on the then-applicable felony murder theory that the cohort shot and killed Julian K. during defendants' and the cohorts' commission of the robberies of Julian K. and Richard F. and the burglary of Richard F.'s apartment. (Former § 189.) Had the juries been instructed pursuant to the new felony murder rule, which was amended effective January 1, 2019 pursuant to Senate Bill 1437 (§ 189, subd. (e)), they would have been instructed that, in order to convict defendants of first degree murder of Julian K. in count 1, they had to find that defendants were either 1) the actual killers, 2) if not the actual killers, that defendants, with intent to kill, aided and abetted the actual killer (the cohort) in the commission of the murder, or (3) defendants were major participants in the uncharged burglary or in the robberies of Julian K. or Richard F., and defendants acted with reckless indifference to human life in committing at least one of these underlying felonies. (*Gentile*, *supra*, 10 Cal.5th at p. 842.)

But the juries were instructed pursuant to the former felony murder rule that they could convict defendants of the first degree felony murder of Julian K. if they found that defendants (1) committed or attempted to commit, or aided and abetted, or were members of a conspiracy to commit robbery or first degree burglary; (2) they intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more members of the conspiracy commit robbery or first degree burglary; (3) they personally, or a perpetrator who they aided and abetted or conspired with, committed or attempted to

commit robbery or first degree burglary; and (4) while committing or attempting to commit robbery or first degree burglary the perpetrator (the cohort) caused the death of another person. (Former § 189; Former CALCRIM No. 540B (2018).) Former CALCRIM No. 540B also told the juries that, "[a] person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent." Thus, the felony murder instructions allowed the juries to convict defendants of the first degree murder of Julian K. without finding that defendants acted with reckless indifference to human life in committing, aiding and abetting, or conspiring to commit the uncharged burglary or either robbery. (§ 189, subds. (a), (e); 190.2, subd. (d).)[17]

In count 2, the attempted premeditated murder count, the juries were instructed on two alternative legal theories: 1) direct aiding and abetting and 2) natural and probable consequences theories. Regarding direct aiding and abetting, the juries were instructed pursuant to the still-valid theory that they could convict defendants of the attempted murder of Richard F. if they found that defendants aided and abetted the perpetrator (the cohort) in his attempt to murder Richard F., in that defendants knew of the perpetrator's unlawful purpose and specifically intended to and did in fact facilitate, promote, encourage, or instigate the perpetrator in his unlawful attempt to murder Richard F. (CALCRIM Nos. 400, 401, 600 (2018).) But the juries were also instructed that they could convict defendants in count 2 if they found that the perpetrator's (the cohort's)

---

[17] Section 189 currently allows for felony murder liability only under the same conditions that are required for a felony-murder special circumstance allegation to be found true under section 190.2, subdivision (d). (*People v. Superior Court (Ferraro)* (2020) 51 Cal.App.5th 896, 907; *In re Taylor* (2019) 34 Cal.App.5th 543, 561.)

attempted murder of Richard F. was a natural and probable consequences of the uncharged burglary or either robbery. (Fmr. CALCRIM No. 402 (2018).)[18]

In light of Senate Bill 1437, as clarified by Senate Bill 775, the natural and probable consequences theory is no longer a valid theory for murder or attempted murder. "[T]o amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) . . . : "Except . . . as stated in subdivision (e) of Section 189, in order to be convicted of murder [or attempted murder], a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Gentile*, *supra*, 10 Cal.5th at p. 842; Stats. 2021, ch. 551, § 1, subd. (a).) The instructions on the now-defunct natural and probable consequences theory allowed the juries to convict defendants of the attempted murder of Richard F. in count 2 based on defendants' participation in the robberies or the uncharged burglary, without finding that defendants acted with malice aforethought in aiding and abetting the cohort's commission of the attempted murder (§ 188, subd. (a)(3)), or with reckless disregard for human life in committing the felonies (§ 189, subd. (e)).

As the parties agree, the People cannot show that the instructional errors in counts 1 and 2 were harmless beyond a reasonable doubt in that the errors did not contribute to verdicts in counts 1 and 2. (*Chapman v. Cal.* (1967) 386 U.S. 18, 24.) The *Chapman* standard is the correct standard for assessing the prejudicial effect of the instructional

---

[18] The juries were also instructed that they could find the premeditation allegation in count 2 true if they found defendants guilty of the attempted murder and that only the perpetrator intended to kill Richard F. (Former CALCRIM No. 601 (2018).)

errors in counts 1 and 2. (*People v. Aledamat* (2019) 8 Cal.5th 1, 10-13 (*Aledamat*), quoting *People v. Chun* (2009) 45 Cal.4th 1172, 1201 [" '[i]nstructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict' "].) Here, "the record does not permit us to rule out a reasonable possibility" that the juries relied on an invalid legal theory in convicting defendants in counts 1 and 2. (*In re Martinez* (2017) 3 Cal.5th 1216, 1224, 1226.) Indeed, there is no basis in the record for concluding that the verdicts in counts 1 and 2 were based on a valid legal ground. (*People v. Chiu* (2014) 59 Cal.4th 155, 167.)

Nedd claims a new trial is warranted on counts 1 and 2 "without regard to prejudice," that is, without regard to whether the instructions errors contributed to the verdicts in counts 1 and 2, because any other rule would violate his due process right to a jury trial on necessary elements of the murder and attempted murder charges. Nedd relies on *People v. Ramos* (2016) 244 Cal.App.4th 99 (*Ramos*), where Division Three of this court declined to apply a harmless error analysis to instructional error that omitted an element of the charged offense. (*Id*. at pp. 102-103.) The *Ramos* defendant was convicted of transporting heroin in violation of Health & Safety Code former section 11352, but following her conviction the statute was retroactively amended to require that the transportation be for purpose of sale rather than personal use. (*Id*. at pp. 102-103.)

*Ramos* reversed the conviction and remanded the matter for a new trial, but was not persuaded that it was proper to assess the instructional error "under the harmless error rubric." (*Ramos*, *supra*, 244 Cal.App.4th at pp. 103-104.) The court reasoned that the

57

application of the retroactive amendment impermissibly deprived the defendant of her "constitutional right to a jury on an element of the charged offense." (*Id*. at p. 104.) But the court also ruled that, even if it was proper to assess the error under the *Chapman* standard, the error was not harmless beyond a reasonable doubt. (*Ibid*.)

The People argue and we respectfully agree that *Ramos* is not good law in light of our Supreme Court's more recent decision in *People v. Merritt* (2017) 2 Cal.5th 819 (*Merritt*).) Merritt held that the failure to instruct on one or more the elements of a charged crime is "serious constitutional error" (*id*. at p. 824) that impacts a defendant's fundamental right to a jury trial, but such errors are amendable to harmless error analysis "as long as the omissions do not vitiate all of the jury's findings" (*id*. at p. 829). Here, the instructional errors in counts 1 and 2 had nothing to do with, and thus did not vitiate, the jury's findings that defendants committed robbery as charged in counts 3 and 4. In addition, the record overwhelmingly shows that the cohort shot and killed Julian K. and shot and wounded Richard F. Thus here, as in both *Merritt* and *Aledamat*, *supra*, 8 Cal.5th at pp. 10 to 13, the instructional errors are amenable to a harmless error analysis. And, as the parties agree, the errors are not harmless beyond a reasonable doubt.

Thus, defendants' murder and attempted murder convictions must be reversed and the matter remanded for a new trial on counts 1 and 2. (*People v. Medrano* (2019) 42 Cal.App.5th 1001, 1021, review granted Mar. 11, 2020, S259948.) Retrial is not barred by double jeopardy principles. (*In re D.N.* (2018) 19 Cal.App.5th 898, 902 ["Double jeopardy forbids retrial after a reversal due to insufficient evidence to support the verdict. [But] [w]here the prosecution makes its case under the law as it stood at trial,

double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency"].) And the People may elect to retry defendants on counts 1 and 2 based on "any currently valid theory." (*Medrano*, at p. 1021.)

B. *Substantial Evidence Supports the Possession Element of Defendants' Convictions for the First Degree Residential Robbery of Julian K.*

Defendants were convicted in count 3 of the first degree residential robbery of Julian K. (§§ 211, 212.5.) Defendants claim insufficient evidence supports their convictions in count 3 because there was no evidence that Julian K. had actual or constructive possession of any of the items taken from Richard F.'s apartment, namely, the shotgun, the several ounces of marijuana, or the money that fell from Richard F.'s pocket as he struggled with Shoulders over the shotgun. Substantial evidence shows that Julian K. was in constructive possession of the marijuana that was taken from the apartment. Thus, we affirm defendants' convictions in count 3.

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 712.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of

59

force or fear." (§ 211.) Thus, to be guilty of robbery, a defendant must take property "from the possession of the victim by means of force or fear." (*People v. Nguyen* (2000) 24 Cal.4th 756, 761.) "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for the purposes of the robbery statute," and "constructive possession" is sufficient. (*People v. Scott* (2009) 45 Cal.4th 743, 749-750.)

A person has constructive possession of property if the person has the right to control the property. (*People v. Scott*, *supra*, 45 Cal.4th at p. 750.) In order to have the right to control property, "the alleged victim . . . [must] have a 'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Ibid*.) As a result of this relationship, such a victim has 'the right to resist the taking," in contrast to "those bystanders who have no greater interest in the property than any other member of the general population." (*Id*. at pp. 757-758.) Special relationships are often employment related. (*Id*. at pp. 752-753.)

But a special relationship may also be present in other circumstances, including, for example, when the victim is the property owner's family member and lives with the property owner. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1386) (*Fiore*) [citing cases].) The crux of the special relationship is that the victim is responsible for protecting and preserving the property taken. (*People v. Gordon* (1982) 136 Cal.App.3d 519, 529 (*Gordon*); *People v. Weddles* (2010) 184 Cal.App.4th 1365, 1370 (*Weddles*); see also *People v. Bekele* (1995) 33 Cal.App.4th 1457, 1461-1462.)

60

*Gordon* illustrates this point. There, two men entered the home of a couple whose son lived with them. At gunpoint, the men ordered the couple to lie on the floor, tied them up, and told them that their son owed the men a lot of money. One of the men went into the son's bedroom and emerged carrying a shoulder bag, and nothing else was taken from the home. The son testified that he lost $1,000; two pounds of marijuana; and a shoulder bag from his bedroom. (*Gordon*, *supra*, 136 Cal.App.3d at pp. 523-524.)

*Gordon* held that the couple was in constructive possession of their son's property, even though the couple denied knowing about the marijuana and were not questioned about the $1,000 or the shoulder bag. (*Gordon*, *supra*, 136 Cal.App.3d. at p. 529.) The court acknowledged that "[t]he only evidence in the record to support a finding of possession is the fact [the couple] owned and lived in the residence[,]" but reasoned that, if business employees such as store clerks have a duty to protect and preserve property entrusted to them, then parents have "at least the same responsibility to protect goods belonging to their son who resides with them in their home." (*Ibid.*)

Similarly here, substantial evidence shows Julian K. was responsible for protecting and preserving Richard F.'s marijuana; thus, Julian K. had constructive possession of the marijuana when it was taken from the apartment. Julian K. and his daughter lived in the apartment with Richard F., and Julian K. was helping Richard F. make the marijuana sale to Shoulders at the time the marijuana was taken. Most significantly, Julian K. initially stopped the cohort from coming into the apartment. Then, at Richard F.'s direction, Julian K. took a portion of the marijuana outside to show to the cohort and was supposed to collect $100 from the cohort, as the cohort's contribution toward purchasing the

marijuana. This evidence is sufficient to support the possession element of defendants' convictions in count 3 for the first degree residential robbery of Julian K.

Defendants rely on two factually distinguishable cases: *People v. Ugalino* (2009) 174 Cal.App.4th 1060 (*Ugalino*) and *Fiore*, *supra*, 227 Cal.App.4th 1362. In *Ugalino*, the court reversed the attempted robbery conviction of a marijuana dealer's roommate, Jessie Rider. (*Ugalino*, at p. 1065.) The dealer, Joshua Johnson, was selling marijuana from his apartment, and Rider lived in the apartment with Johnson. (*Id.* at p. 1062.) The defendant and another man came to the apartment to buy marijuana from Johnson, who kept his marijuana in a locked safe in his bedroom. (*Ibid.*) After Johnson retrieved the marijuana from his safe, the defendant pointed a gun at Johnson and said, " 'You're getting jacked.' " (*Id.* at pp. 1062-1063.) The defendant's cohort then pointed a gun at Rider and told Rider to lie face down on the floor. (*Id.* at p. 1063.) Rider was in the front room of the apartment and had done nothing to assist Johnson in making the marijuana sale. (*Id.* at p. 1062.)

The *Ugalino* court distinguished *Gordon* and the employment cases, reasoning that there was no parent-child or employment relationship between Johnson and Rider; rather, the two "were simply roommates." (*Ugalino*, *supra*, 174 Cal.App.4th at p. 1065.) Rider "had no obligation to protect" Johnson's belongings, Johnson "was present to protect his own belongings" at the time of the robbery, and there was no evidence that Johnson expected Rider to assist Johnson in protecting his marijuana or other belongings. (*Ibid.*) In sum, because there was no evidence that Rider "owned, had access to, control over, or

62

an obligation to protect" Johnson's marijuana, the court reversed the defendant's conviction for attempting to rob Rider. (*Ibid*.)

*Ugalino* is distinguishable, in part because Julian K. actively assisted Richard F. in effecting Richard F.'s attempted sale of the stolen marijuana to Shoulders. More significantly, Julian K. initially prevented the cohort from entering the apartment, then took a portion of the marijuana outside the show to the cohort and agreed to collect $100 from the cohort toward the purchase price for the marijuana. This evidence supports an inference that there was an understanding between Richard F. and Julian K., such that Julian K. had an obligation to protect Richard F.'s marijuana from being stolen and was therefore in constructive possession of the marijuana at the time it was taken.

*Fiore*, *supra*, 227 Cal.App.4th 1362 is also distinguishable. The defendant, Fiore, was convicted of robbing Chris Gault during a marijuana sale. Gault introduced Fiore's friend and cohort, David Fields, to the marijuana owner and seller, Anthony Young. (*Id*. at p. 1368.) Fiore and Fields drove to Young's house, where Fields was supposed to buy 20 pounds of marijuana from Young. (*Ibid.*) Fiore and Fields armed themselves, drove to Young's house, and Young and Gault came out to meet them. (*Ibid*.) Inside the house, Fields and Fiore pointed guns at Young and Gault and left the house with the marijuana. (*Id*. at pp. 1368-1369) Fiore, for his part, pointed a gun at Gault and threatened to kill him. (*Ibid*.) In reversing Fiore's conviction for robbing Gault, *Fiore* relied on *Ugalino* and found insufficient evidence of a special relationship between Young, the marijuana owner and seller, and Gault. (*Id*. at pp. 1385-1387.)

Significantly, Gault testified that Young was only an " 'acquaintance,' " whom Gault knew only " '[in] passing,' " that Gault had never been to Young's house before, and that Gault did not act as a broker and did not expect to earn any commission from the marijuana sale.  (*Fiore*, *supra*, 227 Cal.App.4th at p. 1386.)  But when Young told Fields to " '[c]heck . . . out' " the marijuana, Gault handed Fields a bag of the marijuana and rolled blunts for Fiore and Fields to smoke.  (*Ibid.*)  Although Fiore testified that he understood Gault to be "brokering" the marijuana sale, and that Fields (but not Young) had promised to pay Gault $100 for each pound of marijuana sold, there was "nothing in the record to suggest that Gault was involved in negotiating the sale's terms beyond the fact that [Gault] was present while Fields and Young were talking."  (*Ibid.*)  "Young's acquiescence to Gault's momentary control over the property" for the "limited purpose" of letting Fiore and Fields "sample it" "did not establish that Gault had any right or duty to resist the property's taking or that Young expected him to do so."  (*Ibid.*, citing *Ugalino*, *supra*, 174 Cal.App.4th at p. 1065.)

In contrast, the record here supports a reasonable inference that Julian K. and Richard F. had an understanding and a special relationship, such that Julian K. had a duty to resist the taking of Richard F.'s marijuana.  As discussed, Julian K. played an active role in protecting Richard F.'s marijuana during Richard F.'s attempt to sell the marijuana to Shoulders.  Most significantly, Julian K. stopped the cohort from entering the apartment, where the marijuana sale was taking place, and where Julian K. and his daughter lived with Richard F.  This fact, coupled with Julian K.'s role in assisting

64

Richard F. with the marijuana sale by showing the marijuana to the cohort and attempting to collect $100 from the cohort, distinguishes this case from *Ugalino* and *Fiore*.

C. *CALCRIM No. 315 Did Not Violate Defendants' Due Process Rights*

Each jury was instructed pursuant to CALCRIM No. 315 [Eyewitness Identification], that it had heard eye witness testimony identifying the defendant; that, as with any other witness, it "must decide whether an eyewitness gave truthful and accurate testimony"; and, in evaluating identification testimony, it was to consider fifteen questions, including "How certain was the witness when he or she made an identification?"

Nedd claims the instruction violated his state and federal due process rights to a fair trial because it instructed his jury to consider an eyewitness's level of certainty when evaluating the truthfulness and accuracy of the eyewitness's identification. Nedd claims that, by causing his jurors to falsely equate certainty with accuracy, CALCRIM No. 315 deprived him of a fair trial by lowering the prosecution's burden of proof on the charges. Nedd more specifically claims that the prosecution's case against him "hinged on" Richard F.'s positive identification of him as the "third suspect" who entered the apartment after the initial shots were fired, and who took money and marijuana. At trial, Richard F. testified he was "a hundred percent positive" that the third man was Nedd. Shoulders joins Nedd's due process challenge to CALCRIM No. 315, without additional argument.

Our Supreme Court recently addressed a defendant's due process claim concerning the certainty factor of CALCRIM No. 315 in *People v. Lemcke* (2021) 11 Cal.5th 644,

65

653-654 (*Lemcke*). As in *Lemke*, defendants' due process claims are based on empirical research showing that a witness's confidence in his or her identification is generally not a reliable indicator of accuracy. (*Id.* at p. 655 [citing cases discussing empirical research].) Based on this research, defendants claim that CALCRIM No. 315 "reinforce[s] a common misconception" that an eyewitness's level of certainly in his or her identification correlates to the level of accuracy of the identification.

*Lemcke* concluded that CALCRIM No. 315 did not render the defendant's trial fundamentally unfair, or otherwise violate the defendant's due process rights, because the instruction did not " '[e]quate certainty with accuracy.' " (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) To the contrary, the instruction "leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Ibid.*) The instruction also states that the People have the burden of proving beyond a reasonable doubt that the defendant committed the crime, and if the People do not meet this burden, the jury has to find the defendant not guilty. (*Id.* at p. 658.)

For these reasons, and in light of the instructions as a whole, *Lemcke* concluded that CALCRIM No. 315 did not lower the prosecution's burden of proof and thus did not deprive the defendant of his due process right to a fair trial. (*Lemcke*, *supra*, 11 Cal.5th at pp. 657-659.) *Lemcke's* analysis applies with equal force here to each defendant's trial and requires us to reject defendants' due process claims based on CALCRIM No. 315.

66

D. *Remand for a* Franklin[19] *Hearing for Nedd is Unwarranted*

Nedd was born in 1994 and was 21 years old when he committed the charged offenses on August 6, 2015.  Because he was sentenced to 25 years to life for the murder of Julian K. in count 1, Nedd will be eligible for release on parole at a youth offender parole hearing during his 25th year of incarceration.  (§ 3051, subd. (b)(3).)  At that hearing, the board of parole hearings will be required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).)  The relevant youth-related factors will include Nedd's cognitive ability, his character, and his social and family background at the time he committed the murder.  (See *Franklin*, *supra*, 63 Cal.4th at p. 269.)

Nedd asks this court to remand the matter to the trial court so he may make a record of mitigating youth-related evidence for the purpose of his eventual youth offender parole hearing.  This was the remedy afforded to the defendant in *Franklin*, a youth offender who was convicted and sentenced before section 3051 was amended, effective January 1, 2016, to require youth offender parole hearings for offenders who were 25 years of age or younger at the time they committed their controlling offense.  (Stats. 2015, ch. 471, § 1; § 3051, subd. (a)(2)(B); see *Franklin*, *supra*, 63 Cal.4th at pp. 269-272.)  Nedd effectively claims that he is entitled to the same relief afforded to the defendant in *Franklin*.  He is not.

---

[19] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

Nedd was sentenced in August 2019, more than three years after *Franklin* was decided in May 2016. In *People v. Medrano* (2019) 40 Cal.App.5th 961, this court was presented with an identical situation and found no basis to remand the matter to the trial court to conduct a *Franklin* hearing for the defendant, who was sentenced in December 2017, more than 18 months after *Franklin* was decided. (*Medrano*, at p. 967.) *Medrano* reasoned that the record contained "no indication that Medrano was not given an adequate opportunity to make a record of mitigating youth-related evidence as contemplated in *Franklin*. . . . Rather, it appear[ed] that he merely failed—whether by choice or by inadvertence—to exercise [that opportunity]." (*Ibid.*)

As in *Medrano*, the record contains no indication that Nedd was not given an adequate opportunity, at or before his sentencing hearing on August 23, 2019, to make a record of youth-related mitigating evidence. On January 12, 2018, Shoulders filed a "*Franklin* Statement in Mitigation," including a report by a licensed clinical psychologist who testified at length at Shoulders's *Franklin* hearing on May 29, 2018. Shoulders's *Franklin* hearing was held immediately after the hearing on defendants' *original* new trial motions on May 29, 2018,[20] and Nedd was represented by counsel at the May 29 hearing. But Nedd made no effort to present any youth-related mitigating evidence, at the May 29 hearing, at his August 23, 2019 sentencing hearing, or at any other time.

---

[20] In 2019, defendants supplemented their new trial motions by challenging their convictions in count 1 and 2 based on the amendments that Senate Bill 1437 (2017-2018 Reg. Sess.) made to sections 188 and 189.

Nedd also has a remedy for his previous failure to seek a *Franklin* hearing: He may present youth-related mitigating evidence by way of a Penal Code section 1203.01 motion. A youth offender whose judgment of conviction and sentence is final may file a motion pursuant to section 1203.01, and the court's inherent authority under Code of Civil Procedure section 187, to make a record of youth-related mitigating evidence. (*Medrano*, *supra*, 40 Cal.App.5th at p. 968; *In re Cook* (2019) 7 Cal.5th 439, 446-447 (*Cook*).) As *Cook* observed, section 1203.01 "provides that, postjudgment, the trial court may generate, collect, and transmit information about the defendant and the crime to the Department of Corrections and Rehabilitation." (*Cook*, at p. 447.)

In sum, because Nedd had an adequate opportunity to adduce youth-related mitigating evidence before he was sentenced on August 23, 2019, and because he may yet adduce such evidence after his judgment becomes final (§ 1203.01), we find no basis to remand the matter with directions to the trial court to conduct a *Franklin* hearing for Nedd. (*Medrano*, *supra*, 40 Cal.App5th at pp. 967-968) But we are not precluding the trial court from allowing Nedd to make a *Franklin* record on remand.

E. *No Cumulative Trial Error*

Defendants claim that the cumulative effect of the trial errors deprived them of their due process right to a fair trial and requires reversal of all of their convictions. We are vacating defendants' convictions in counts 1 and 2, and we have found no trial error affecting defendants' remaining convictions in counts 3 and 4, or affecting Nedd's conviction in count 6. Thus, neither defendant is entitled to reversal of their remaining

69

convictions based on cumulative error. (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.)

## V.  DISPOSITION

Defendants' convictions for the first degree murder of Julian K. in count 1, and for the attempted premeditated murder of Richard F. in count 2, are reversed.  Defendants' first degree residential robbery convictions in counts 3 and 4 and Nedd's unlawful firearm possession conviction in count 6 are affirmed.  If the People elect to retry either defendant on counts 1 and 2, the People must bring defendants to trial within 60 days after the remittitur is filed.  (§ 1382, subd. (a)(2).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____

J.

We concur:


RAMIREZ _____

P. J.


McKINSTER _____

J.